Melvin D. REUBER, Plaintiff–Appellee,

v.

FOOD CHEMICAL NEWS, INC.,
Defendant–Appellant,

and

Litton Industries, Inc.; Litton Bionetics, Inc.; Vincent T. Devita, Jr., National Cancer Institute, National Institute of Health; Richard Adamson, National Cancer Institute, National Institute of Health; William V. Hartwell, National Cancer Institute, National Institute of Health; William Payne, Frederick Cancer Research Center; Michael G. Hanna, Jr., Frederick Cancer Research

Center; James C. Nance, Litton Bionetics, Inc.; I.J. Fidler, Frederick Cancer Research Center; United States of America; U.S. Department of Health and Human Services; Environmental Protection Agency, Defendants,

The Newsletter Association; Maryland–Delaware–District of Columbia Press Association; National Association of Broadcasters; the Radio–Television News Directors Association; the Reporters Committee for Freedom of the Press; Washington Merry–Go–Round, Inc.; the Washington Post, Amici Curiae.

No. 88–2641.

United States Court of Appeals,
Fourth Circuit.

Argued Oct. 2, 1990.

Decided Feb. 5, 1991.

As Amended Feb. 12 and Feb. 27, 1991.

Aaron L. Handleman, argued (Melissa Chappell–White, on brief), Eccleston and Wolf, Washington, D.C., for defendant-appellant.

Raymond Donald Battocchi, argued (Isaac N. Groner and Walter H. Fleischer, on brief), Cole and Groner, P.C., Washington, D.C., for plaintiff-appellee.

Lee Levine and James E. Grossberg, Ross, Dixon & Masback, Washington, D.C., on brief, for amici curiae Newsletter Ass'n, Maryland–Delaware–District of Columbia Press Ass'n, Washington Merry–Go–Round, Inc.

Henry L. Baumann and Steven A. Bookshester, Washington, D.C., on brief, for amicus curiae Nat. Ass'n of Broadcasters.

J. Laurent Scharff, Pierson, Ball & Dowd, Washington, D.C., on brief, for amicus curiae Radio–Television News Directors Ass'n.

Jane E. Kirtley, Washington, D.C., on brief, for amicus curiae Reporters Committee for Freedom of the Press.

Boisfeuillet Jones, Jr. and Barbara P. Percival, Washington, D.C., on brief, for amicus curiae Washington Post.

Before ERVIN, Chief Judge, and RUSSELL, WIDENER, HALL, PHILLIPS, MURNAGHAN, SPROUSE, CHAPMAN, WILKINSON, WILKINS and NIEMEYER, Circuit Judges, sitting en banc.

WILKINSON, Circuit Judge:

Melvin Reuber was employed as a scientist at a research center operated for the National Cancer Institute (NCI). While operating under the aegis of the NCI, Reuber disseminated his own research and took other actions which created the misleading impression that the NCI had reversed its official position that the pesticide malathion was a non-carcinogen. By such actions, Reuber, a self-styled whistleblower, entered the public controversy swirling around malathion's safety. In response to Reuber's involvement, his supervisor issued a letter of reprimand which criticized Reuber for, among other things, promoting inadequate research and subverting public confidence in the NCI. A news publication received a copy of the letter and published the majority of its contents. Reuber then sued and won a judgment against the publication for defamation and invasion of privacy.

In reviewing Reuber's claims, we hold that a whistleblower is not invariably immune from public figure status and that recovery in this instance must be judged under an actual malice standard, a standard Reuber has failed to satisfy. In addition, we hold that appellant did not invade Reuber's privacy. We therefore reverse the district court's judgment.

I.

Melvin Reuber is no stranger to the scientific and political debates raging over the carcinogenicity of chemical pesticides. He began his research on carcinogens in the 1950s during his graduate training in pathology. In the early 1970s, Reuber served as a consultant to the Environmental Protection Agency on the carcinogenicity of certain chemicals, including pesticides. In this capacity, Reuber testified at EPA hearings and at a Senate subcommittee hearing. At these hearings, Reuber established himself as a scientist who frequently found pesticides to be carcinogens. At one hearing, for example, he challenged the validity of reports submitted by the chemical companies on pesticide safety, deeming most of the reports to be "worthless."

In 1976, Reuber started work with the Frederick Cancer Research Center ("FCRC"). Litton Bionetics operated the FCRC under a contract with the National Cancer Institute ("NCI"), a public agency. At the FCRC, Reuber studied the carcinogenic effects of various chemicals. Reuber also performed independent research on his own time, often using materials and facilities at Tracor Jitco, another facility under contract with the NCI. As part of his independent research, Reuber analyzed the pesticide picloram and concluded that it was a carcinogen. He delivered his findings at a conference in Oregon in the late 1970s. At the conference, Reuber touted his abilities to accurately determine carcinogenicity. He also reported his views on the carcinogenicity of picloram in a study that environmental groups in Wisconsin utilized to oppose the use of picloram in the state.

As an additional part of Reuber's independent research, he reanalyzed bioassays testing the potential carcinogenicity of malathion, an insecticide. These bioassays had been deposited at Tracor Jitco by other scientists under contract to the NCI. These scientists had found malathion to be non-carcinogenic and reported their findings in an official NCI report. Reuber concluded, on the contrary, that malathion was carcinogenic and assembled his findings in an unpublished manuscript.

Reuber's research on malathion gained prominence during the Mediterranean fruit fly ("Medfly") infestation of California in 1980–81. State officials proposed the use

of malathion to eradicate the Medfly. The question of how to eradicate the Medfly, in particular the proposed use of malathion, engendered a significant public controversy pitting state agricultural interests against those of other groups, including environmentalists. A California environmental group began using Reuber's malathion manuscript, which it had earlier requested from Reuber, as ammunition in its battle to oppose the use of malathion. Although Reuber based the manuscript on his independent research, the address that appeared on the paper directly below Reuber's name was "NCI, Frederick Cancer Research Center/Frederick, Maryland 21701."

By affiliating his own study with the NCI/FCRC in this way, Reuber created confusion over the official NCI position on the potential carcinogenic effects of malathion. In fact, California state health officials contacted NCI to determine whether Reuber's manuscript represented the current NCI position or whether NCI adhered to the findings of its prior published study. Drs. Vernon Hartwell and Richard Adamson, two NCI executives, responded to this confusion by contacting Dr. Michael Hanna, Reuber's supervisor at FCRC and its director, and urging him to investigate Reuber's activities.

On March 26, 1981, Hanna reprimanded Reuber in a letter (the "Hanna letter") asserting that Reuber had engaged in various forms of professional misconduct: creating the impression that the NCI endorsed his independent research, engaging in inadequate research, spending excessive time away from his job, and ignoring NCI publication clearance procedures. For example, the letter states, "you have operated under the guise of the endorsement of both NCI and the ... FCRC. These obstreperous actions have had a multi-million dollar implication, giving the impression that the NCI may be administering programs of questionable competency." On the adequacy of research, the letter states that after reviewing the evidence, "I can only assume that your statement regarding your thorough evaluation of these slides was incorrect and misleading ... thus raising a question of whether your interpretation is scientifically valid."

Hanna sent copies of the reprimand letter to officials at Litton and the NCI. This letter was then leaked to outside parties. How the letter leaked from its initial recipients has not been determined. In any event, on April 13, 1981 an anonymous source provided Dr. William Hollis of the National Agricultural Chemicals Association with a copy of the letter. Hollis then forwarded a copy to Jack Wise of Stauffer Chemical Company. Wise, in turn, informed Catherine Cooper, the editor of the Pesticide and Toxic Chemical News ("PTCN" or "the News"), about the letter. The PTCN is a newsletter with approximately 1,300 subscribers seeking information on pesticides and toxic chemicals. Appellant Food Chemical News owns PTCN. On April 15, 1981, Cooper published an article about the Hanna letter, essentially reprinting most of the letter's contents. It is undisputed that Wise gave Cooper an accurate copy of the Hanna reprimand and that the News reported accurately its contents. On April 24, 1981, Reuber resigned from Litton.

Reuber then filed suit in federal district court for the District of Columbia against the Food Chemical News as well as his employers and supervisors. The suit against the Food Chemical News was eventually transferred to the United States District Court for the District of Maryland and is the only one before us on appeal. The district court held a jury trial on Reuber's common law claims against the News for defamation and invasion of privacy. On the defamation count, the jury found that the News had acted with actual malice in publishing one or more false statements about Reuber. The jury also held the News liable for invasion of privacy. It awarded Reuber $625,000 in compensatory damages and $250,000 in punitive damages.

The News appealed the district court's judgment. A panel of this circuit affirmed the judgment for Reuber. *Reuber v. Food Chemical News, Inc.*, 899 F.2d 271 (4th Cir.1990). The court then voted to rehear the case en banc and we now reverse the

judgment of the district court. We will treat Reuber's two claims in turn, defamation followed by invasion of privacy.

## II.

In assessing Reuber's defamation claim we shall assume, without deciding, that at least one of the statements in the News' account of the Hanna letter was false. We shall also assume that the falsity damaged Reuber. What remains to be determined by this court is Reuber's status as private or public figure. The court must then decide whether Reuber adequately proved his case against the News under the appropriate standard of culpability.

We hold that Reuber is a limited purpose public figure for this appeal because he voluntarily injected himself into a public controversy "in order to influence the resolution of the issues involved." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 345, 94 S.Ct. 2997, 3009, 41 L.Ed.2d 789 (1974). As a public figure, he must prove actual malice to recover either compensatory or punitive damages. In fulfilling our constitutional duty to review the record independently, we hold that Reuber has failed to demonstrate actual malice by clear and convincing evidence. Therefore, the award of damages for defamation must be reversed.

## A.

■ To recover compensatory damages for defamation, a public official or public figure must show actual malice, while a private figure may recover under a lower standard of culpability. *Gertz*, 418 U.S. at 347–48, 94 S.Ct. at 3010–11. To recover punitive damages for defamation related to a matter of public concern, any party regardless of status must show actual malice under a clear and convincing evidence standard. *See Milkovich v. Lorain Journal Co.*, —— U.S. ——, 110 S.Ct. 2695, 2703–04, 111 L.Ed.2d 1 (1990). Because the culpability standards for recovering compensatory damages depend so much upon a plaintiff's status, we must determine Reuber's status as public or private figure. This determination is ultimately one of law.

*Fitzgerald v. Penthouse Int'l, Ltd.*, 691 F.2d 666, 669–70 (4th Cir.1982).

The News contends that Reuber is a public figure based on his participation in controversies involving the use of pesticides, especially the malathion controversy. In response, Reuber argues he is a private person who merely headed a pathology lab at FCRC and "was not known to the public at large."

■ In *Fitzgerald v. Penthouse*, this court set forth a five-factor test for determining whether a party is a public figure. 691 F.2d at 668. The first of *Fitzgerald*'s factors asks whether "the plaintiff had access to channels of effective communication." 691 F.2d at 668. In *Hutchinson v. Proxmire*, the Supreme Court determined that a defamed behavioral scientist was not a public figure, in part, because his access to channels of communication was extremely limited. 443 U.S. 111, 135–36, 99 S.Ct. 2675, 2688–89, 61 L.Ed.2d 411 (1979). In contrast, Reuber had significant access to channels of effective communication before and during the time the News published the article on the letter of reprimand. Reuber had testified before the Congress and the Environmental Protection Agency and had given lectures on the health threats associated with various pesticides. In addition, Reuber's findings on malathion were discussed in numerous television, newspaper, and radio reports. Reuber also gave at least one interview to a California paper on the perils of malathion at the very height of the controversy. Perhaps most significantly, Reuber had access to important public health and scientific sources of communication. For example, Reuber had thirty-five or more published papers to his credit. He had also been mentioned in eleven articles in the News prior to its publication of the article on the reprimand letter. These are the fora where Reuber's reputation was presumably tarnished and where it could be redeemed.

The inquiry into access to channels of communication proceeds on the assumption that public controversy can be aired without the need for litigation and that rebuttal of offending speech is preferable to re-

course to the courts. *Gertz,* 418 U.S. at 344, 94 S.Ct. at 3009. Reuber, however, attempted little or no rebuttal. He neither requested a retraction or correction of the News report nor sought to respond to the News' story in a subsequent issue; instead, he raced to court.

The inappropriateness of this course of action is apparent when one examines the combined second and third factors of the *Fitzgerald* analysis: whether the plaintiff has voluntarily assumed a role of special prominence in a public controversy by attempting to influence the outcome of the controversy. 691 F.2d at 668. These twin factors reflect a "normative consideration that public figures are less deserving of protection than private persons because public figures, like public officials, have 'voluntarily exposed themselves to increased risk of injury from defamatory falsehood concerning them.'" *Wolston v. Reader's Digest Ass'n, Inc.,* 443 U.S. 157, 164, 99 S.Ct. 2701, 2706, 61 L.Ed.2d 450 (1979) (citations omitted). In *Hutchinson v. Proxmire,* the Court held that Hutchinson did not voluntarily enter a controversy over federal government accountability simply by accepting federal funding for his research. 443 U.S. at 135, 99 S.Ct. at 2688. Hutchinson was completely unknown to the public before Senator Proxmire presented him with the "Golden Fleece" award.

■ Reuber's research, again by contrast with Hutchinson's, was quite familiar to most of those involved in the public debate over the carcinogenicity of pesticides, in particular malathion. Someone who has not attracted general notoriety may nonetheless be a public figure in the context of a particular controversy covered by publications of specialized interest. *See, e.g., Waldbaum v. Fairchild Publications, Inc.,* 627 F.2d 1287, 1290, 1300 (D.C. Cir.1980) (supermarket executive, whose actions were reported extensively in trade publications, was a limited-purpose public figure). As Cooper, the editor of the News, testified, Reuber had a reputation within the scientific community as someone who usually found a chemical to be a carcinogen. Moreover, Reuber described himself as "eminent" in his field. Reuber's involvement in the California malathion controversy began in late 1979 or early 1980 when he received a request from the John Muir Institute of California, an environmental group, for information on various chemicals, including malathion. Reuber sent the Institute a copy of his malathion paper. The environmental group then widely disseminated Reuber's findings on malathion. For example, the Institute included excerpts from Reuber's paper in a hand-out the group distributed at a press conference held by the state on its Medfly eradication proposals. In addition, after California health officials learned of Reuber's research, they conducted their own study and concluded that malathion was safe. An attorney for a California county, which opposed the spraying of malathion, also requested and received from Reuber a copy of his manuscript.

Reuber argues that providing a manuscript that is used by others in a controversy does not meet the *Fitzgerald* requirement of voluntarily entering a controversy. We cannot accept this claim in his case. *See, e.g., National Found. for Cancer Research, Inc. v. Council of Better Business Bureaus, Inc.,* 705 F.2d 98, 101–02 (4th Cir.1983). Under Reuber's view, one could knowingly disseminate his views to the combatants in a controversy, and then disavow public figure status when his views and credentials are vigorously challenged. We do not think the law provides the sort of artificial shield that Reuber claims, and believe the question of personal injection into a public controversy must be more particularly evaluated.

■ Reuber also contends that he cannot be a public figure because many of his activities related to malathion occurred prior to the discovery of the Medfly in California. We note, however, that even "involuntary" participants can be public figures when they choose a course of conduct which invites public attention. *See, e.g., Clyburn v. News World Communications, Inc.,* 903 F.2d 29, 33 (D.C.Cir.1990); *McDowell v. Paiewonsky,* 769 F.2d 942, 949–50 (3d Cir.1985). Reuber invited attention by

authoring and by disseminating a study which challenged the government's conclusions that malathion, a widely used pesticide, was non-carcinogenic.

Even if Reuber's arguments accurately reflected the law, they ignore the considerable body of evidence that he entered into the malathion controversy voluntarily. The evidence reflects an individual knowingly deploying himself on the front-lines of debate. For example, Reuber furthered the dissemination of his malathion study by referring interested parties, including a California congressman, to the John Muir Institute for copies of his study. Further, Reuber wrote a letter to the director of the California Department of Food and Agriculture and sent a copy to an official of the California Department of Public Health in early 1981 in an attempt to influence the outcome of the malathion controversy. In that letter, Reuber criticized an earlier NCI malathion study and stressed the superiority of his own scientific credentials. Reuber even included his curriculum vitae and bibliography. The letter concluded by inviting these officials to contact Reuber for further assistance.

The means by which Reuber injected himself into the malathion controversy are also significant. He circulated findings of his own malathion research with his office address attached indicating his affiliation with the FCRC and the NCI. Similarly, he wrote his letters to the California health officials on FCRC stationery and signed them "Melvin D. Reuber, MD/Head, Experimental Pathology Laboratory." Further, Reuber took issue with the position of the NCI which was funding the facilities at which he performed his research. By taking issue with the NCI in studies and letters that at the same time indicated his affiliation with the agency, Reuber not only voluntarily injected himself into the malathion controversy by vigorously promoting his own views and research, but did so in a manner that was bound to create confusion over what the official agency position was.

The fourth *Fitzgerald* factor analyzes whether "the controversy existed prior to the publication of the defamatory state-

ments." 691 F.2d at 668. The News argues this requirement is easily met because in 1981, at the time the News printed the Hanna letter, people were hotly debating the use of pesticides, including malathion. As Reuber's complaint recognizes: "around the end of 1980, controversies developed in the States of California and Wisconsin, and elsewhere, over the desirability of the wide scale use of malathion and picloram."

Reuber contends, however, that the fourth *Fitzgerald* requirement cannot be met because the editor of the News admitted that she did not intend to publish the article in the context of the malathion controversy. Here, appellee attempts to introduce the subjective element of the author's intent into the determination of public figure status. We reject this approach in favor of the objective approach outlined in *Waldbaum v. Fairchild Publications*, 627 F.2d at 1293–94. Any reasonable observer examining the reprimand letter could conclude that it addressed the malathion controversy. For instance, the Hanna letter refers to the impact of Reuber's study on the California agricultural economy. More specifically, the reprimand letter refers to Reuber's correspondence with the Director of the California Department of Food and Agriculture in which Reuber challenged the credibility of the government's malathion research. The reprimand letter also refers to speeches, telephone calls, and reports Reuber made in which he challenged the competency of the government's malathion researchers. Thus, the fourth requirement for public figure status is met.

The fifth and final *Fitzgerald* factor addresses whether "the plaintiff retained public figure status at the time of the alleged defamation." 691 F.2d at 668. The News published the alleged defamation at the height of the malathion controversy, several months before spraying of malathion actually began. Reuber's research was therefore still important to the outcome of the controversy.

This analysis of the *Fitzgerald* factors demonstrates that Reuber, unlike the defamed behavioral scientist in *Hutchinson*

*v. Proxmire,* was very much a public figure in the malathion dispute. We do not say that every whistleblower is a public figure because such a broad statement would unduly chill necessary criticism of government conduct. It is true, of course, that the prospect of public figure status may chill some potential critics of government action, but the chill is no greater than it would be for any person about to enter the rough and tumble of a public controversy. The rules designed to test public figure status remain what they have always been. By classifying Reuber as a public figure we affirm that the First Amendment is a two-way street. The Amendment assumes that hard blows may be swapped in the search for just outcomes. Reuber may use his research to challenge the credibility of scientists employed by the government; but when other scientists respond by challenging his credibility and the media reports these challenges, Reuber has little right to cry foul. As a public figure, Reuber must prove actual malice to recover either compensatory or punitive damages for defamation.

### B.

We thus begin the inquiry into actual malice. As a first step, we examine the jury instructions and conclude that the court erred in its instructions on the critical element of actual malice. That error alone requires a remand, but the inquiry does not end there. We must next determine whether Reuber proved actual malice by clear and convincing evidence for if he did not, we would enter judgment for the News rather than remanding for a new trial. This determination is in turn informed by the existence of a fair report privilege on the part of the News.

### 1.

■ Appellant contends that the trial court erred as a matter of law when instructing the jury on actual malice. The court gave this instruction to the jury:

> You are instructed that actual malice exists when the person making the statement knowingly and deliberately lies or

makes the statement with knowledge that it is false or with reckless disregard for its truth or falsity.

It is not enough to show merely that the publisher failed to investigate the truth of the statements. A failure to estimate standing alone is not actual malice. However, a failure to follow accepted standards of journalistic practice can be considered in determining whether the element of reckless indifference is present.

> If you find that the News published an article whose substance makes substantial danger to reputation apparent and that it engaged in conduct which is an extreme departure from the standards of investigation and reporting normally adhered to by responsible publishers, the element of reckless indifference may be established.

In the first paragraph, reckless disregard is undefined. Indeed, the judge never informed the jury that reckless disregard relates to a state of mind in which a "defendant in fact entertained serious doubts as to the truth of his publication." *St. Amant v. Thompson,* 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968). Instead, the jury was informed that reckless disregard may be established by showing a departure from accepted journalistic practices. Here, the district court resurrected Justice Harlan's approach to reckless disregard stated in *Curtis Publishing Co. v. Butts,* 388 U.S. 130, 155, 87 S.Ct. 1975, 1991, 18 L.Ed.2d 1094 (1967) (plurality opinion). That approach, however, did not command a majority in *Butts* and "there is no question that public figure libel cases are controlled by the *New York Times* standard and not by the professional standards rule, which never commanded a majority of this Court." *Harte–Hanks Communications, Inc. v. Connaughton,* 491 U.S. 657, 109 S.Ct. 2678, 2685, 105 L.Ed.2d 562 (1989). *See also Ryan v. Brooks,* 634 F.2d 726, 731 (4th Cir.1980) (expressly recognizing that the Supreme Court has never endorsed the professional standards rule). In fact, the *Harte–Hanks* Court went to some lengths to reaffirm

that a departure from accepted standards alone does not constitute actual malice. *See* 109 S.Ct. at 2684–85.

Thus, the trial court erred as a matter of law in its instructions to the jury on actual malice. When " 'it is impossible to know, in view of the general verdict returned' whether the jury imposed liability on a permissible or an impermissible ground, 'the judgment must be reversed and the case remanded.' " *Greenbelt Publishing Ass'n v. Bresler,* 398 U.S. 6, 11, 90 S.Ct. 1537, 1540, 26 L.Ed.2d 6 (1970) (quoting *New York Times Co. v. Sullivan,* 376 U.S. 254, 284, 84 S.Ct. 710, 728, 11 L.Ed.2d 686 (1964)). This principle should operate with special force in this case because it is not at all unlikely that the jury rested its finding of actual malice on the impermissible ground of a departure from accepted standards. For instance, the jury foreman, during a break in deliberations, asked the court for a transcript of the testimony of "the three expert reporters who testified as experts." This testimony focused on whether the News departed from accepted journalistic standards.

### 2.

While the error in the jury instructions would alone mandate reversal, this cannot end our inquiry. The question remains whether to remand the cause for a new trial or to direct entry of judgment for the News.

■■■ To decide this question, we must examine whether Reuber proved actual malice by clear and convincing evidence. While the Supreme Court in *Harte–Hanks* did not endorse making departures from journalistic standards the determinant of actual malice, it did recognize that such standards might serve as supportive evidence for a reviewing court in its determination of this critical element of recovery. 109 S.Ct. at 2686. In this regard, we think the inquiry into actual malice may properly be informed by the existence *vel non* of a "fair report privilege" on the part of the News. While the sources of the fair report privilege are in some dispute, several circuits have recognized that a privilege which goes to the heart of news organizations' ability to report to citizens about their government is one with constitutional implications. *See, e.g., Lee v. Dong–A Ilbo,* 849 F.2d 876, 878 (4th Cir.1988); *Medico v. Time, Inc.,* 643 F.2d 134, 143–45 (3d Cir. 1981); *Edwards v. National Audubon Society, Inc.,* 556 F.2d 113, 120 (2d Cir.1977). A fair report privilege shields news organizations from defamation claims when publishing information originally based upon government reports or actions. In one sense, the presence of a privilege and the absence of actual malice are separate defenses, but in another sense they are related. While it is, of course, possible that a possessor of a qualified privilege could nonetheless be acting with reckless disregard of truth, the existence of a privilege diminishes the likelihood of that occurrence.

This is so because of the premises underlying the fair report privilege. The fair report privilege is an exception to the republication rule and is designed to mitigate its harsh effects. "Under the republication rule, one who repeats a defamatory statement is as liable as the original defamer," *Lee,* 849 F.2d at 878, unless, of course, the repetition is a privileged one. We recognize a fair report privilege, in part, because of the open relationship we seek to share with our own government. *Id.* at 879. While the news media of necessity has something of an adversarial relationship with government officials, that relationship coexists with the function recognized by the fair report privilege simply to inform citizens of what the government is doing. Government documents serve as "the basic data of governmental operations." *Cox Broadcasting Corp. v. Cohn,* 420 U.S. 469, 492, 95 S.Ct. 1029, 1044, 43 L.Ed.2d 328 (1975). The fair report privilege encourages the media to report regularly on government operations so that citizens can monitor them. In return for frequent and timely reports on governmental activity, defamation law has traditionally stopped short of imposing extensive investigatory requirements on a news organization reporting on a governmental activity or document. *See, e.g., Rushford v. New Yorker*

*Magazine, Inc.*, 846 F.2d 249, 254 (4th Cir. 1988). Inevitably, this reduces the chances that a news organization could actually know that a government report contained false charges or could maintain serious doubts about them.

With these considerations in mind, we address whether the fair report privilege should apply to the News' article. Reuber contends that the News should not be accorded a fair report privilege because the factual predicate for the privilege, a report on a government action or document, is absent in this case. In this respect, he argues that the reprimand letter constitutes the actions of private entities, Hanna and the FCRC, rather than governmental entities. We believe, on the contrary, that the letter does qualify as official action for the purposes of a fair report privilege. The decision to discipline Reuber, and the letter embodying this decision, "invoked the power and prestige of the National Cancer Institute so as to make the decision a governmental one in perception as well as reality." *Reuber v. United States*, 750 F.2d 1039, 1057 (D.C.Cir.1984). For example, the letterhead on which Hanna wrote the reprimand states that the FCRC is operated by Litton for the National Cancer Institute, a government agency. The letter also asserts that Reuber operated under the guise of the NCI. Moreover, the letter suggests that Reuber is being disciplined, at least in part, for undermining the public's trust in the National Cancer Institute. These factors together point to the presence of government action.

Reuber also contests the legal foundations for the privilege in this case. In *Lee*, the circuit recognized three specific rationales for the creation of a fair report privilege as applied to government actions or documents: agency, public supervision, and the public's right to information. 849 F.2d at 878. Under the agency rationale, a reporter acts as an agent for members of an otherwise preoccupied public which could, if it possessed the time, energy, or inclination, inform itself about a government report or action. Reuber argues that the fair report privilege should not shield the News because the agency rationale for the privilege is absent in this case. He states that Hanna intended the letter to be an internal, not a public, reprimand. Consequently, members of the public could not have informed themselves about the reprimand.[1]

We need not decide in this case whether the agency rationale encompasses only those documents which the government has officially released and which the public would have immediate access to or whether it also encompasses otherwise confidential documents which someone has placed in the public domain. We do not think that the scope of the agency rationale would be dispositive here because the other two rationales for a fair report privilege, public supervision and public information, are plainly present. *See, e.g., Medico*, 643 F.2d at 136–42 (absence of the agency rationale is not controlling when the other two rationales are present). The public supervision rationale recognizes that news organizations play an important role in providing the public with information it needs to monitor the operations of government. The Hanna letter provides citizens with information they need to evaluate how the carcinogenic properties of various chemicals are determined and, by extension, how an important government agency, the NCI, is waging the war against cancer. The public information rationale focuses on the public's interest in matters affecting the public welfare. The Hanna letter sheds light on the malathion controversy, certainly an important public matter involving an impending public decision.

We wish to make plain, however, that our holding is not without limits. By recognizing a fair report privilege in these circumstances, we neither authorize em-

1. While Hanna may have intended the letter as an internal reprimand, nevertheless the fact remains that numerous individuals outside the original circle of recipients saw the letter before it reached the News. For example, at least twelve people in the chemical industry received copies of the letter. One of these twelve used information in the letter to lobby an Environmental Protection Agency official. In addition, the letter was apparently posted on a public bulletin board at the EPA.

ployers to leak information from personnel files, nor suggest that the fair report privilege would always shield a news organization when reporting such leaked information. Instead, we hold narrowly that reporting the contents of a reprimand letter invoking the prestige of a government agency, attacking the conclusions of a well-known critic of that agency, and addressing a controversy with significant implications for public health and for economic well-being, fairly falls within the ambit of the privilege. To adopt Reuber's contrary view would be to issue a broad judicial declaration that reports of reprimands of any whistleblowers (or, for that matter, news reports of any internal memorandums critical of government agencies or operations) were not protected by the privilege, no matter how important they were to public controversies or how essential they might be to public evaluations of a public agency. We decline to depart in such a fashion from the settled law of free expression.

Whether the fair report privilege should be characterized as absolute or qualified in its relationship to actual malice has been the subject of debate. *See, e.g., Medico,* 643 F.2d at 143–45. We believe that the News enjoyed, at a minimum, a qualified privilege to reprint the Hanna letter and that this privilege is relevant to any appellate inquiry into actual malice. Moreover, an understanding of the privilege is critical to the context in which the report took place. Much of the justification for news reports of this nature is rooted in the purposes of the privilege; to find reckless disregard of truth in instances in which the privilege encourages reporters to report in timely fashion on the workings of government will exact costs upon one of the basic functions of a free press. While not conclusive of the inquiry into malice, the existence of the privilege makes it more difficult for a reviewing court to conclude that a news report on government functions was published in reckless disregard of the truth.

### 3.

■ We must address finally Reuber's claim that, notwithstanding the existence of the privilege, there was evidence of actual malice. Actual malice is a subjective standard. Plaintiff must prove that the defendant made the statement "with knowledge that it was false or with reckless disregard of whether it was false or not." *New York Times v. Sullivan,* 376 U.S. at 280, 84 S.Ct. at 726. Reckless disregard has in turn been defined as publishing with a "high degree of awareness of ... probable falsity." *Garrison v. Louisiana,* 379 U.S. 64, 74, 85 S.Ct. 209, 216, 13 L.Ed.2d 125 (1964). The Supreme Court has stressed that "an appellate court has an obligation to 'make an independent examination of the whole record' in order to make sure that 'the judgment does not constitute a forbidden intrusion on the field of free expression.' " *Milkovich,* 110 S.Ct. at 2705 (citations omitted). In undertaking this examination, we must determine whether the record establishes actual malice with convincing clarity. We are mindful, however, that this standard of review does not transform an appellate court into a super-jury, nor does it give us free reign to revisit credibility determinations or to redetermine findings of historical fact. *Harte–Hanks,* 109 S.Ct. at 2699 (White, J., concurring).

This independent review of the record does, however, embody two variations from the standard practice. First, the requirement of independent review departs from the considerable deference an appellate court normally accords to a fact-finder's determinations. *See, e.g., Inwood Laboratories v. Ives Laboratories,* 456 U.S. 844, 855, 102 S.Ct. 2182, 2189, 72 L.Ed.2d 606 (1982). Second, the convincing clarity standard, that is the requirement of clear and convincing evidence, departs from the usual preponderance of the evidence rule governing most civil cases. *Addington v. Texas,* 441 U.S. 418, 423, 99 S.Ct. 1804, 1807, 60 L.Ed.2d 323 (1979). The Supreme Court in construing the significance of a clear and convincing standard has noted: "[N]ot only does the standard of proof reflect the importance of a particular adjudication, it also serves as 'a societal judg-

ment about how the risk of error should be distributed between the litigants.' " *Cruzan v. Director, Missouri Dep't of Health,* —— U.S. ——, 110 S.Ct. 2841, 2854, 111 L.Ed.2d 224 (1990) (citations omitted). Both the independent review requirement and the heightened evidentiary standard reflect the importance associated with defamation judgments. This importance stems from the crippling effect the casual award of defamation damages can have upon the freedom of the press and, indeed, upon the "free exchange of ideas" generally. *Harte–Hanks,* 109 S.Ct. at 2695.

■ We begin our review by examining the evidence which Reuber and the district court believed sufficient to establish actual malice on the part of the News. The trial court observed that Cooper never assessed the impact that reprinting the serious charges contained in the reprimand letter would have on Reuber's reputation and career. The law of defamation, of course, protects against false damage to reputation, but the falsity of charges cannot be equated with their seriousness. Controversies with a serious public impact will contain their share of serious charges, and the *New York Times* rule is not to be suddenly suspended for a news organization whenever the stakes run high. If that were the case, the vitality of debate would suffer at the point when the need for information and illumination was uppermost. Nor can Cooper's alleged insensitivity to Reuber's career or reputation be the basis for recovery. There are limits to the lengths to which news organizations can be expected to go in protecting the sensibilities of one side in a public debate. The failure to protect reputation cannot alone constitute actual malice, for indeed it is inescapable to public controversy that reputations are at risk.

Here, the trial court seemed almost to infer that Cooper, by being insensitive to Reuber's reputation, harbored an ill will towards Reuber. Even if Cooper harbored ill will towards Reuber, and there is no evidence of that, the Supreme Court consistently has held that "the actual malice standard is not satisfied merely through a showing of ill will or 'malice' in the ordinary sense of the term." *Harte–Hanks,* 109 S.Ct. at 2685. *Accord, Hustler Magazine v. Falwell,* 485 U.S. 46, 53, 108 S.Ct. 876, 880, 99 L.Ed.2d 41 (1988); *Garrison v. Louisiana,* 379 U.S. at 73–74, 85 S.Ct. at 215–216. In *Harte–Hanks,* the trial judge carefully instructed the jury that ill will and actual malice were not equivalent. 109 S.Ct. at 2685 n. 7. The trial judge in Reuber's case did not similarly admonish the jury. In fact, the trial court instructed the jury that "publish[ing] an article whose substance makes substantial danger to reputation apparent" is one of two elements comprising actual malice, the other element being a departure from journalistic standards. This instruction enhanced the risk that ill will and actual malice might be confused, and that liability might be imposed on something quite different from the *New York Times* standard.

■ As additional evidence that Cooper allegedly acted with reckless disregard, the trial court noted that Cooper never questioned whether Jack Wise, the person who gave the copy of the reprimand letter to Cooper, or his chemical company employer had a strong incentive to harm Reuber's professional reputation. Actual malice cannot be proven simply because a source of information might also have provided the information to further the source's self-interest. Self-interest (and the related desire to place opposing views and persons in an unfavorable light) motivates many news sources; if dealing with such persons were to constitute evidence of actual malice on the part of a reporter, much newsgathering would be severely chilled. The fact that Wise or his employer "had a strong incentive to diminish the impact of Dr. Reuber's scientific work" cannot constitute a finding of malice. Reuber, in turn, had a strong incentive to diminish the impact of NCI's conclusions and those of his superiors who worked there, and strong incentives to disprove are what debate is all about.

■ Reuber also alleges that actual malice can be inferred because a profit motive drove the News to publish the Hanna letter. He characterizes the News as a

mouthpiece for the chemical industry. In his view, the News published the Hanna letter to discredit Reuber, an opponent of some chemical companies, and thereby increase its standing with its chemical industry subscribers.

The News may have subscribers in the chemical industry, but it also has subscribers in academia, in public citizen and environmental groups, and in the government. The very fact that the News had printed eleven previous stories reporting Reuber's various legal activities and research efforts (often opposing the interests of chemical companies) calls into some question Reuber's contention that the News is the uncritical mouthpiece of the chemical industry. But the profit motive or the political orientation of the News is hardly the dispositive point. The cases from *New York Times v. Sullivan* onward teach that evidence of a defendant printing material to increase its profits does not suffice to prove actual malice. *Harte–Hanks*, 109 S.Ct. at 2685. *New York Times* itself involved a paid advertisement. 376 U.S. at 265–66, 84 S.Ct. at 718–19. Moreover, it is hardly unusual for publications to print matter that will please their subscribers; many publications set out to portray a particular viewpoint or even to advance a partisan cause. Defamation judgments do not exist to police their objectivity; the First Amendment presupposes that a veritable medley of opposing voices is better suited to the search for truth. *See, e.g., New York Times v. Sullivan*, 376 U.S. at 270, 84 S.Ct. at 720 (citing *United States v. Associated Press*, 52 F.Supp. 362, 372 (S.D.N.Y.1943)).

Reuber also contends that Cooper's attitude toward the accuracy of the allegations contained in the reprimand letter reveals her reckless disregard of the truth. For example, the trial court observed that Cooper testified that she made a conscious decision not to inquire into the truth or falsity of Hanna's allegations in the letter. Even if Cooper made such a decision, that decision does not prove actual malice under these circumstances. In *St. Amant v. Thompson*, 390 U.S. 727, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968), a lower court listed as part of its rationale for finding actual malice that a political candidate had no personal knowledge of the activities of the public official he allegedly defamed during a television broadcast. *Id.* at 730, 88 S.Ct. at 1325. Instead, the candidate relied solely on the affidavit of a union member whose reputation for veracity the candidate did not know. In addition, he failed to verify the information with those in the union office who might have known the facts. *Id.* The Supreme Court held that this evidence, evidence remarkably similar to that relied on by the trial court in the present case, did not prove reckless disregard. *Id.* The Court noted that no evidence existed indicating that the candidate was aware of the probable falsity of the union member's statements or had reason to doubt his source's veracity. "Failure to investigate," the Court emphasized, "does not in itself establish bad faith." *Id.* at 733, 88 S.Ct. at 1326.

Here, the News and its editor had no apparent reason to question the truthfulness of the Hanna letter. A presumably reliable author, the director of a federally-sponsored cancer research center, wrote the letter on official FCRC letterhead. The author characterized the allegations against Reuber as ones which "I have investigated and have found to be true." Furthermore, the source that gave Cooper the Hanna letter had provided her with reliable information previously. "Certainly where there was no reason to doubt the accuracy of the sources used, the failure to investigate further, even if time was available, cannot amount to reckless conduct." *Ryan v. Brooks*, 634 F.2d at 733.

The trial judge also relied on Cooper's testimony that she would have published the Hanna letter even if she had known some of the allegations were false as evidence of reckless disregard. Cooper stated, for example, that she would print the article even if some of the allegations were false because it would be newsworthy that the director of a federally funded cancer research center was leveling false charges at his employee, an eminent cancer researcher. The Hanna letter might further show, even if part or all of it was false,

that the government was attempting to muzzle a critic of its policies on carcinogenic pesticides. In that case, Cooper appears to contend that the First Amendment would protect the News when it fulfilled its obligation to inform the public about an event of indisputable significance.

We need not debate the merits of that view, however, because Cooper's testimony is of limited relevance. Actual malice means a defendant published a story with a "high degree of awareness of ... probable falsity." *Garrison v. Louisiana*, 379 U.S. at 74, 85 S.Ct. at 216. Cooper's response to a hypothetical question on whether she would have published the article even if some of the allegations were false has nothing to do with whether she had a high degree of awareness that some of the allegations actually were false. This is simply not a case where the veracity of charges is highly suspect although the headline potential of the story is apparent. *See, e.g., Curtis Publishing Co. v. Butts*, 388 U.S. at 157, 87 S.Ct. at 1992. The evidence of actual falsity in Hanna's allegations is, not surprisingly, murky and the evidence that Cooper was on notice of their probable falsity is even more remote.

Of course, false allegations add little to public debate; indeed they detract from it. *See Hustler Magazine v. Falwell*, 485 U.S. at 52, 108 S.Ct. at 880. It would be ideal if the truth or falsity of every charge could be instantly determined by the press. Unfortunately, however, truth or falsity is often not instantly ascertainable. In the hurly burly of political and scientific debate, some false (or arguably false) allegations fly. The press, however, in covering these debates, cannot be made to warrant that every allegation that it prints is true. *See, e.g., Milkovich*, 110 S.Ct. at 2702–04 (tracing the evolution of defamation law away from strict liability). If this burden were imposed through the law of defamation, news organizations would become ever more officious referees in the ring of robust debate, and the free exchange of views would be diminished to the public detriment. *See, e.g., Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 772–73, 106 S.Ct. 1558, 1561–62, 89 L.Ed.2d 783

(1986) (warning of the dangers of excessive media self-censorship). Prior censorship by the press of every conceivably false charge in the course of an intense public controversy also possesses dangers to the values protected by the First Amendment—dangers which in some particulars parallel those of censorship by the state.

In addition, the reality of the newsgathering process counsels against requiring the press to guarantee that every allegation on the part of a public disputant is correct. Here, the editor of the News received her copy of the Hanna letter on April 13 or 14. The News, a weekly, was scheduled for printing on April 15. Had Cooper missed the April 15 deadline, she could not have published again for a week and her readers might have been deprived of a timely report. Since the spraying of malathion had not yet occurred and its properties were still under debate, the News provided its readership with information essential to informed debate on the point. It will often be the case, of course, that investigative journalists will and should defer publication until the accuracy of charges can be determined. The law of defamation necessarily presupposes some tradeoffs in the timeliness of publication in the interests of accurate and responsible reporting. To incorporate a further guarantee of the non-falsity of every published charge during a heated public controversy is, however, to sacrifice the timeliness of news reporting to a far greater degree than *New York Times* allows or that the rapid-fire nature of public debate would permit. *See, e.g., Hunt v. Liberty Lobby*, 720 F.2d 631, 643 (11th Cir.1983) (recognizing that standards of investigation vary with the timeliness of a news item); *Ryan v. Brooks*, 634 F.2d at 733 (accord). Some part of the burden for demonstrating falsity surely lies with the opposing public figures in a public controversy—a demonstration better made on the field of polemical battle than in a defamation suit.

Finally, Reuber points to Cooper's alleged failure to analyze two passages in the Hanna letter that Reuber considered contradictory. At one point in the letter,

Dr. Hanna states: "Your mishandling of scientific data and your unrestrained interpretations" have had a significant impact on state economies as well as shaking public trust in the NCI. At a later passage in the letter, Dr. Hanna writes: "You may be correct in your interpretations, but the rest of the scientific community ... has not had the advantage ... of learning and evaluating your view since you declined to pass it through the standard review procedure...." Reuber's counsel asked Cooper: "You would have had to know that one of the two charges Dr. Hanna made had to be false." Cooper responded, "I'm not in a position to judge that."

When examining this testimony, it is important to note that the trial court treated it as evidence of reckless disregard, but not actual knowledge of falsity. Based on this characterization, we independently review the testimony under the standard mandated by *Harte–Hanks*. *See* 109 S.Ct. at 2694–95. *See also id.* at 2699 (White, J., concurring) (independent review standard governs questions of reckless disregard). In this connection, the limited excerpt from Cooper's trial testimony distorts her actual response to the question of harmonizing the two statements in the reprimand letter. In reality, Cooper clearly explained that the reference to mishandling data referred specifically to data on malathion, while the second reference to interpretations being correct referred generally to Reuber's ability as a pathologist. The expectation on Reuber's part, however, that Cooper would parse the Hanna letter in detail to determine which charges leveled by a government official on one side of a public controversy were true is exactly the type of self-censorship about which our prior discussion has forewarned. Reuber's own attacks upon the integrity of NCI research and the government's conclusions were subject to no such prior screening at the hands of the press. He can hardly expect that his adversary's response will be subjected to such screening in the interest of protecting him.

In sum, there was no actual malice here because the News did not publish with knowledge of the letter's falsity or in reck-less disregard of its truth under *New York Times v. Sullivan*. Reuber's manifold contentions would transform the *New York Times* standard for actual malice into one far less protective of the purposes of free expression. His cause of action seeks to impose wholly unprecedented burdens on news organizations in the interest of conducting a one-way debate. We reject the attempt to silence one's adversaries in a public controversy by suing organizations attempting to inform the public about questions raised as to the research of every putative defamation plaintiff. Upholding this judgment would have the ironic effect of stifling debate within the community of scientists at a time when the implications of scientific research are ever more far reaching and when the public's understanding of professional credentials and conclusions must be correspondingly enhanced.

## III.

Turning to the remaining claim, we must determine whether the News invaded appellee's privacy. We hold that the News did not and reverse the award for invasion of privacy.

The trial court instructed the jury that invasion of privacy is "the intrusion upon another person's solitude, seclusion, private affairs or concerns in a manner which would be highly offensive to a reasonable person ... [or] the publicizing of true facts concerning the private life of another which are not of legitimate concern." This instruction recognizes two varieties of invasion of privacy: intrusion and publication of private facts.

### A.

■ Appellant argues that the court erred by instructing the jury on intrusion under the circumstances. We agree, as apparently did the panel. 899 F.2d at 283 n. 24. The intrusion prong of invasion of privacy requires a positive act by a defendant, aside from publication, that encroaches on a plaintiff's seclusion. *See, e.g., The Florida Star v. B.J.F.*, 491 U.S. 524, 109

S.Ct. 2603, 2609–10, 105 L.Ed.2d 443 (1989). Here, the News simply published the Hanna letter; it is undisputed that the News played no role in leaking the letter from its initial group of recipients. Had the News or its agent unlawfully obtained the reprimand letter, this might qualify as a positive act. *Id.*, 109 S.Ct. at 2610 n. 8. Yet assuming the facts most favorable to Reuber, that a government official at NCI leaked the Hanna letter in violation of government policy, this violation does not mean the News unlawfully obtained the reprimand. *Id.* at 2610–11. Because the News did not act to intrude on Reuber's privacy, Reuber cannot recover under that theory.

### B.

■ To recover for invasion of privacy for the publication of private facts, a party must show that an article publicized private facts in a highly offensive manner about an issue not of public concern. *Restatement (Second) of Torts* § 652D (1977); *Hollander v. Lubow*, 277 Md. 47, 351 A.2d 421 (1976). Initially, we must assess whether the News article publicized private facts. We note that if information is already in the public domain when published by a defendant, it does not qualify as private facts. *See Hollander v. Lubow*, 351 A.2d at 427–28. Similarly, the Supreme Court has recognized that a person's privacy interest in information fades when that information is present in the public domain prior to publication by a news organization. *See The Florida Star*, 109 S.Ct. at 2610; *Smith v. Daily Mail Publishing Co.*, 443 U.S. 97, 103, 99 S.Ct. 2667, 2670, 61 L.Ed.2d 399 (1979); *Cox Broadcasting Corp. v. Cohn*, 420 U.S. at 494–96, 95 S.Ct. at 1045–47.

■ The record reflects a number of ways in which the Hanna letter was in the public domain prior to publication in the News. For example, William Hollis and Jack Wise, both employed in the chemical industry, obtained copies of the reprimand letter. Wise, in turn, gave copies of the reprimand letter to at least ten colleagues in the chemical industry. Wise and his colleagues planned to distribute the letter independent of its publication in the News.

In addition, Wise used the contents of the Hanna letter in his lobbying efforts with an EPA official. Copies of the reprimand letter were apparently posted on a public bulletin board at the Environmental Protection Agency. *Reuber v. United States*, 829 F.2d 133, 137 (D.C.Cir.1987). Also, Reuber had given the reprimand letter to a friend who worked at the EPA and made copies of the letter at Reuber's request. By the time of the letter's publication by the News, therefore, the reprimand letter had already been circulating both at the EPA and among industry sources.

■ In addition, appellant argues that Reuber has failed to satisfy the remaining two elements necessary to support his cause of action: the article was not published in a highly offensive manner and the Hanna letter is a matter of legitimate public concern. We agree and note that *Bilney v. Evening Star Newspaper Co.*, 43 Md.App. 560, 406 A.2d 652 (1979), provides guidance for our ruling. In *Bilney*, six University of Maryland basketball players sued the *Washington Times* and a student newspaper for invasion of privacy when these newspapers published stories revealing that these players were on academic probation. The basketball players claimed their academic records at the university were confidential information—a purely private matter unaffected by any public interest.

The *Bilney* court rejected the players' contentions by noting that " 'the legitimate interest of the public in the individual may extend beyond those matters which are themselves made public, and to some reasonable extent may include information as to matters that may otherwise be private.' " 406 A.2d at 659 (quoting *Restatement (Second) of Torts* § 652D, comment e). The news media acts unreasonably when the information published becomes " 'a morbid and sensational prying into private lives for its own sake' " that offends common decency. 406 A.2d at 660 (quoting *Restatement (Second) of Torts* § 652D, comment h). The Maryland court held, however, that because the players "sought and basked in the limelight by virtue of

their membership on the team," they could not complain when the light shined on information showing that they might have to withdraw from the team. 406 A.2d at 660.

Reuber maintains that *Bilney* does not control here because basketball at the University of Maryland involves a matter of public concern while the Hanna reprimand is purely a matter of private concern. The Hanna letter, however, touched not only upon the carcinogenic hazards of malathion spraying but also upon the effectiveness of the government's fight against the scourge of cancer. Moreover, as we have already noted, Reuber sought the limelight associated with a controversy of immense public concern—as great, some might warrant, as the fortunes of a college basketball program.

Finally, the Supreme Court's decisions on invasion of privacy counsel against accepting appellee's claim. In these cases, the Court has been presented with challenges to state statutes that effectively created causes of action for invasion of privacy if the media identified participants in certain legal proceedings or victims of certain crimes. *See The Florida Star, supra; The Daily Mail, supra; Oklahoma Publishing Co. v. District Court,* 430 U.S. 308, 97 S.Ct. 1045, 51 L.Ed.2d 355 (1977); *Cox Broadcasting, supra.* Crime victims, especially, are involuntary participants in the criminal justice system. Nevertheless, the Court has consistently held that the public's right to know how its law enforcement agencies and courts are performing outweighs an individual's asserted privacy interest. *See, e.g., The Florida Star,* 109 S.Ct. at 2607–08. Similarly, we believe that the public's right to know how its government functions in a significant public health controversy outweighs the privacy interest of a public figure who, unlike the crime victims denied recovery by the Court, voluntarily entered the controversy.

Reuber also argues that denying him recovery for invasion of privacy will mean that every bureaucrat whose work has some impact on a matter of public concern will lose all privacy interests in his or her confidential personnel file. We in no way believe that our decision will create the situation Reuber hypothesizes. The scope of our holding does not extend to "every bureaucrat"; rather our holding is limited to those figures who by nature of their activity become public figures. A researcher like the scientist in *Hutchinson v. Proxmire* who was not a public figure would have a greater privacy interest in the contents of his personnel file than would a researcher, like Reuber, whose persistent efforts to enter a public controversy transformed him for the limited purposes of that controversy into a public figure.

Other measures are also available to protect a public figure's privacy that entail far fewer costs to the cause of free discussion. *See, e.g., The Florida Star,* 109 S.Ct. at 2609–10 (less drastic means than punishing publication are almost always available to protect privacy). When the press lacks a right of access, nothing prevents an employer or holder of confidential information from refusing to reveal it. Moreover, nothing in our decision prevents a public figure from suing his employer for leaking the supposedly confidential contents of his personnel file. Such a suit compensates the injured plaintiff and encourages employers to maintain the confidentiality of their files. Reuber, in related litigation, indeed sought relief from his employers under the Privacy Act, 5 U.S.C. § 552a(e)(6) (1982), and under state law.

## IV.

The judgment of the district court awarding damages against the News for invasion of privacy and defamation imposes exorbitant costs on public debate, costs we decline to assess. To uphold Reuber's manifold claims would be to disable the government from rebutting charges by employees that the positions taken by government agencies were ill-founded, ill-motivated, or even corrupt. We think the First Amendment protects the right of persons both within and without government to challenge vigorously the conclusions of public agencies. We also think, however, that the Amendment protects the right of the party

charged with ineptitude or malfeasance to respond. Finally, we believe the Amendment protects the public's right to learn about both sides of the controversy through the press. Accordingly, we decline to uphold an award of damages that would leave only a legacy of one-sided debate.

The judgments for defamation and invasion of privacy are reversed and the case is remanded for entry of judgment for the defendant.

REVERSED AND REMANDED.

WILKINS, Circuit Judge, dissenting:

For the reasons set forth in the panel opinion, *Reuber v. Food Chemical News, Inc.*, 899 F.2d 271 (4th Cir.1990), the jury verdict should not be disturbed. Statements in the reprimand letter received by Cooper through an anonymous source proved to be false and libelous, a conclusion supported by the record and determined to be so by the trial jury. Indifference to the falsity of these statements was demonstrated by Cooper's testimony that she "made a conscious decision not to inquire whether the statements contained in it were true or false," and would have published the letter even if she knew that some or all of the statements were false. The jury considered the evidence and found actual malice pursuant to an unexceptional charge. I respectfully dissent.

Chief Judge ERVIN, Circuit Judge MURNAGHAN and Circuit Judge SPROUSE have asked to be shown as joining in this dissent.