**Richard Lloyd CARR, Plaintiff–Appellant,**

v.

**FORBES, INCORPORATED; Matthew Schifrin; John Does, Defendants–Appellees.**

**No. 00–2555.**

United States Court of Appeals, Fourth Circuit.

Argued June 7, 2001.

Decided Aug. 1, 2001.

**ARGUED:** William Marvin Grant, Jr., Grant & Leatherwood, P.A., Greenville, SC, for Appellant. Wallace K. Lightsey, Wyche, Burgess, Freeman & Parham, P.A., Greenville, SC, for Appellees. **ON BRIEF:** Langdon Cheves, III, Grant & Leatherwood, P.A., Greenville, SC, for Appellant. Carl F. Muller, Wyche, Burgess, Freeman & Parham, P.A., Greenville, SC; Tennyson Schad, Norwick & Schad, New York, NY, for Appellees.

Before LUTTIG, DIANA GRIBBON MOTZ, and GREGORY, Circuit Judges.

Affirmed by published opinion. Judge MOTZ wrote the opinion, in which Judge LUTTIG and Judge GREGORY joined.

## OPINION

DIANA GRIBBON MOTZ, Circuit Judge:

Richard Lloyd Carr, an engineer who develops privately financed public infrastructure projects, brought this action asserting that Forbes, Incorporated defamed him by publishing an article casting doubt on the integrity of his conduct and his representations concerning those projects. Because Carr is a limited-purpose public figure who has forecast no evidence that Forbes acted with actual malice in publishing the article, we affirm the district court's grant of summary judgment to Forbes.

### I.

Carr has spent his career managing the development of public infrastructure projects; he assembles construction proposals, finds teams of engineers to build such projects, and identifies sources of funding for them. In 1992, an engineering company that Carr owned ran into financial trouble leading to its demise and Carr's personal bankruptcy. Carr then contacted a former employer, the Dana Larson Roubal Group (DLR), a large national engineering and architectural firm, and convinced DLR to provide seed money to form a new company, Interwest Management, Inc., through which Carr, as President and CEO, could continue managing the development of public infrastructure projects with public-private financing methods.

In the early 1990s, Carr contracted to develop a sewer for the town of Quartzsite, Arizona. Carr served as his firm's public representative for the project and maintained a prominent profile in the project's development. The sewer project tapped into local political passions and, in 1993 when the town elected a new mayor who had campaigned against the sewer system, the town canceled construction of the sewer and refused to pay Interwest for the work that the firm had completed. Interwest and the town proceeded to arbitration, resulting in an award in Interwest's favor. After the town refused to honor the award, Interwest sued to recover its fees.

As Interwest was developing the Quartzsite project, officials in Apache Junction, Arizona, who were familiar with Carr's work in Quartzsite, contacted Carr seeking to develop a sewer system for their town. In August of 1991, these officials and Carr's firm signed a contract to build a similar sewer in Apache Junction. Regulators had imposed a building moratorium on Apache Junction, the largest town in the United States without a sewer, because of its inadequate sewage disposal system; yet, local voters had twice voted against the tax increases necessary to finance such a system. Carr proposed that the town form a private sewer district that could operate the sewer by collecting fees and thereby avoid new taxes. After Carr arranged to create a sewer district, that district hired Interwest to build and manage the project and financed it through the issuance of bonds, all of which the Allstate Insurance Company, Inc. purchased. However, Interwest had apparently relied on unreasonably optimistic projections and an erroneous database of potential customers. Due to a lack of customers, the sewer district was unable to pay off its bonds and ultimately filed for bankruptcy. Allstate then sued all members of the Interwest team for fraud.

In July 1995, as the Apache Junction sewer project neared completion, South Carolina officials solicited bids to build the Southern Connector, a highway intended to connect I-85 with I-385 in Greenville County, South Carolina. Carr and Interwest arranged that a new corporation, Interwest Carolina, LLP, be formed to bid for the contract to build this highway. Carr had no ownership stake in Interwest Carolina, which, like Interwest, was controlled by DLR. The record does not reveal whether Carr was an officer in Interwest Carolina, but indisputably he continued to serve as President and CEO of Interwest itself. Bob Farris, a former Federal Highway Administration Commissioner, was the "public face" of Interwest Carolina. Carr served as the project's manager and behind-the-scenes facilitator and shared with Farris joint authority for the project.

After a competitive bidding process in March of 1996, South Carolina selected Interwest Carolina to complete the Southern Connector project. Among the many firms Carr drew together to form the Interwest Carolina team was Wilbur Smith Associates.

Controversy immediately ensued over the highway project. Indeed, its opponents brought suit, contending that the project required a local referendum, a position the South Carolina Supreme Court ultimately rejected. When word of the Allstate lawsuit against Interwest reached South Carolina, state officials developed concerns as to the competency and honesty of Interwest Carolina. The Allstate suit became the topic of local news coverage and local officials investigated the allegations in that suit to determine whether Interwest Carolina should continue on the project. South Carolina officials decided

to take no action and Interwest Carolina continued its work on the Southern Connector.

In its July 7, 1997 edition, *Forbes* magazine printed an article entitled "Moonshine Bonds" that was centered on Carr. The article suggested that Carr was a shady businessman with a troubled history. The article criticized Carr throughout. For example, it alleged that Carr "smelled money" in public-private financing, that he "exploited" the tax law, and that he sought to target a larger federal funding program as "bigger game" which was "right on [his] turf." In the table of contents, the magazine referred to Carr as the "Moonshine Man." *Forbes* noted Carr's personal bankruptcy, the failure of his prior business, and that he had once hired a convicted felon who had served time in connection with an insurance fraud scheme. The article alluded to the Quartzsite project—stating that it "ended in a legal mess"—and focused on Carr's involvement with the Apache Junction and Southern Connector projects.

Based on the allegations in the Allstate suit, "Moonshine Bonds" charged Carr with personally defrauding Allstate and the town of Apache Junction.[1] The article explained that the Apache Junction sewer district had "busted" because "the feasibility study done by Carr's company had grossly overstated the number of residents who would sign up for sewage connections." Although the magazine noted that "Carr has an explanation for all his failures," specifically the "failure" of Apache Junction, it suggested that any explanation was false by highlighting the fact that Carr's "company drew $1.5 million in project management fees" from the project.

"Moonshine Bonds" further stated that, while Apache Junction residents were

"nursing their wounds," Carr had "moved on" and was now "pushing yet another" project, the Southern Connector. The article claimed that Carr's firm was awarded the Southern Connector contract because it had secured a study by Wilbur Smith Associates, which "project[ed] traffic and toll revenues 50% higher" than a previous study conducted by that same firm. *Forbes* implied that, like the Arizona project, the South Carolina project would fail because it was based on a fraudulent feasibility study. The article noted that Carr had now "set his sights on even bigger game" because he intended to participate in a new federal financing program. It concluded with the statement: "Count on one thing: Those bond sellers [for the Southern Connector] won't be calling on Allstate to unload the Carolina bonds" and recommended that readers "take a pass" on the Southern Connector bonds.

The author of "Moonshine Bonds," Matthew Schifrin, began work on the article after a bond "watchdog," Richard Lehman, alerted him to the potential story. Lehman put Schifrin in touch with George Price, a South Carolina activist working to defeat the Southern Connector. Price provided Schifrin with a notebook of material that he had collected about the project. Schifrin subsequently conducted independent research. In addition to speaking with Price and Lehman, he talked with several other sources, including an Allstate attorney involved in the lawsuit, a financier, a local Arizona town official, and Carr, himself. Schifrin also examined relevant documents including the complaint in the Allstate action and project proposals relevant to the Southern Connector. A *Forbes* employee fact-checked Schifrin's article and verified all of its material facts.

1. The Allstate suit settled after publication of the *Forbes* article for over nine million dollars, of which Interwest paid Allstate $1.25 million.

Soon after the Forbes company published "Moonshine Bonds," DLR, believing Carr to be a public relations problem and no longer "marketable," terminated his employment with Interwest. Carr subsequently brought this defamation suit in June 1999 against Forbes, Schifrin, and several John Does (hereafter, collectively "Forbes"). The district court granted Forbes summary judgment, reasoning that Carr was a limited-purpose public figure who could not prove by clear and convincing evidence that Forbes had acted with actual malice. Carr now appeals.

## II.

We first consider whether Carr is a public figure. If so, the First Amendment, as authoritatively interpreted by the Supreme Court, requires that he bear a substantial burden of proof in this defamation action.

The Court has long recognized that defamation claims potentially chill the free speech rights jealously protected by the First Amendment. Were speakers threatened with potential liability every time they wished to criticize, they would hesitate to provide the public with many important facts and ideas. A free self-governing people must have access to all relevant information—both the laudatory and the critical—when choosing a course of public policy. For this reason, the Court has held that a public figure—a person essentially part of the public debate—may only recover damages "for a defamatory falsehood relating to his official conduct [if] he proves that the statement was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." *New York Times Co. v. Sullivan*, 376 U.S. 254, 279–80, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964).

■ Moreover, a person need not be a public figure in all respects to trigger the actual malice standard. The Supreme Court has also held that, in certain circumstances, the Constitution treats private citizens who are not otherwise public figures as public figures for the purpose of comment upon certain issues. *See Hutchinson v. Proxmire*, 443 U.S. 111, 134, 99 S.Ct. 2675, 61 L.Ed.2d 411 (1979); *Wolston v. Reader's Digest Assoc.*, 443 U.S. 157, 164–68, 99 S.Ct. 2701, 61 L.Ed.2d 450 (1979); *Time, Inc. v. Firestone*, 424 U.S. 448, 454–55, 96 S.Ct. 958, 47 L.Ed.2d 154 (1976); *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 351, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). When a person thrusts himself into the forefront of public debate, he is treated as a "limited-purpose public figure" for purposes of comment on issues arising from that debate. Such "limited-purpose public figures," like other public figures, may only recover for defamatory statements made with actual malice. Forbes contends, and the district court held, that Carr is such a limited-purpose public figure with respect to the issues discussed in "Moonshine Bonds."

■ Whether a person has achieved the status of a limited-purpose public figure is a question of law, which we consider *de novo*. *Foretich v. Capital Cities/ABC, Inc.*, 37 F.3d 1541, 1551 (4th Cir .1994). In answering that question, we conduct a two-part inquiry. First, we ascertain whether a public controversy gave rise to the defamatory statement. Second, we determine whether the plaintiff's participation in that controversy sufficed to establish him as a public figure within the context of that public controversy. *Id.* at 1553. The defendant bears the burden of proving the plaintiff's public figure status.

### A.

■ Determining whether a public controversy gave rise to the article at issue in

this case requires review of the scope of the alleged defamatory statements and the facts surrounding them. A "public controversy" does not encompass every conceivable issue of interest to the public. *Time,* 424 U.S. at 454, 96 S.Ct. 958. Rather, "public controversy" is a legal term of art; the term only encompasses a dispute "that in fact has received public attention because its ramifications will be felt by persons who are not direct participants." *Foretich,* 37 F.3d at 1554.

■ The *Forbes* article primarily addresses the financing and construction of the Apache Junction sewer and the Southern Connector highway. On one hand, Carr argues that neither of these subjects gave rise to a public controversy; he maintains that the article comments only upon isolated "local issues" that had no "ramifications for nonparticipants." On the other hand, Forbes contends that the article describes a broad ranging, important public controversy over public-private financing deals with "nationwide implications."

Neither formulation is wholly accurate. The record clearly demonstrates that the Arizona and South Carolina projects engendered local controversies, but that these controversies do constitute parts of a greater, more general public controversy. One need not, however, inflate this public controversy, as Forbes would, into its most general and amorphous form—public-private financing as a general matter—to capture its significance. Rather, most accurately, the facts before us demonstrate a public controversy over the soundness of privately financed public projects of Carr's Interwest companies, as exemplified by the Apache Junction sewer and Southern Connector highway.

Unquestionably, public attention focused on the legitimacy of the projects described in "Moonshine Bonds." The Apache Junction project received significant publicity in the Arizona community and media both at the time that Interwest developed the project and after its completion. The press also published articles concerning the litigation arising out of the Apache Junction project. Similarly, the local community in South Carolina discussed and debated the Southern Connector. Furthermore, after word of the Apache Junction lawsuit against Interwest reached South Carolina, a public debate ensued over whether the facts alleged in the suit indicated that Interwest Carolina's participation in the Southern Connector would result in similar problems. Indeed, the suit led South Carolina authorities to investigate Interwest Carolina to determine whether its contract to build the Southern Connector should be canceled.

The fact that the controversy addressed by Forbes stirred public debate may be enough to satisfy the requirement that a true public controversy gave rise to the publication. *See Foretich,* 37 F.3d at 1555 (that child custody dispute stirred "public discussion" of child-abuse and civil contempt was enough to create public controversy affecting the public). In addition, however, Carr's conduct in developing public works projects had a concrete impact on the lives of people outside the controversy. Public projects, by definition, exist for the public at large. When public projects are mismanaged and bonds issued to finance those projects fail, those projects may in turn fail, thereby harming the public. The citizens of Apache Junction, Arizona now live in a town with a mismanaged, over-built sewage system that was forced to the brink of bankruptcy. The citizens of South Carolina—and indeed all travelers who might use the Southern Connector—would likewise suffer were the bonds financing that project to fail.

In sum, "Moonshine Bonds" addressed a public controversy.

### B.

We next ask whether Carr's participation in this controversy is sufficient to justify treating him as a limited-purpose public figure for purpose of comment upon it. To "become[ ] a public figure for a limited range of issues," one must "voluntarily inject[ ] himself or [be] drawn into a particular public controversy ." *Gertz,* 418 U.S. at 351, 94 S.Ct. 2997.

■ Therefore, a limited-purpose public figure is essentially one who has assumed a "role of public prominence in the broad question of concern." *Hutchinson,* 443 U.S. at 135, 99 S.Ct. 2675.

■ We have devised a five-factor test to determine whether the plaintiff has thrust himself into a controversy to the extent necessary to trigger limited-purpose public figure status. We consider whether (1) the plaintiff has access to channels of effective communication, (2) the plaintiff voluntarily assumed a role of special prominence in the controversy, (3) the plaintiff sought to influence the resolution of the controversy, (4) the controversy existed prior to the publication of the defamatory statements, and (5) the plaintiff retained public figure status at the time of the alleged defamation. *See Fitzgerald v. Penthouse Int'l, Ltd.,* 691 F.2d 666, 668 (4th Cir.1982). In this case, review of these five factors requires the conclusion that Carr has taken the affirmative steps necessary to inject himself into the controversy surrounding the soundness of his bond-financed public projects and therefore to become a limited-purpose public figure.

■ The heart of our five-factor test is the second and third factors, which we have sometimes combined into the question of "whether the plaintiff has voluntarily assumed a role of special prominence in a public controversy by attempting to influence the outcome of the controversy." *Reuber v. Food Chem. News, Inc.,* 925 F.2d 703, 709 (4th Cir.1991) (en banc). One does not become a limited-purpose public figure merely by contracting with the government or accepting public money, *see Hutchinson,* 443 U.S. at 135, 99 S.Ct. 2675, but one who contracts with the government can become such a public figure because of the way in which he conducts himself in connection with those public contracts. *See, e.g., McDowell v. Paiewonsky,* 769 F.2d 942, 949 (3d Cir.1985) (architect who built public works became limited-purpose public figure through his acts in conjunction with those projects). In this case, Carr did not merely contract with the government; he personally and affirmatively took actions that invited public attention in connection with public contracts.

Although Carr did not own Interwest, the company was his brain-child and he served as the company's President and chief executive. In this position, he was, for all intents and purposes, solely in charge of the company's activities. He hired almost all of its employees, selected its projects, planned its operations, and put together its deals. Carr decided if and how Interwest would develop the Quartzsite and Apache Junction projects and played a critical role in forming Interwest Carolina and supervising its development of the Southern Connector project.

Of course, "activity likely to engender publicity, even criminal activity, does not equate to taking on a role of special prominence in a public controversy." *Wells v. Liddy,* 186 F.3d 505, 536 (4th Cir.1999). Carr, however, did far more than the plaintiffs in *Wolston,* 443 U.S. at 167, 99 S.Ct. 2701 (suspected spy not a public

figure when he "never discussed this matter with the press and limited his involvement to that necessary to defend himself against the contempt charge"), or *Gertz,* 418 U.S. at 352, 94 S.Ct. 2997 (defense counsel in civil case not a public figure in controversy arising from related criminal case when he "took no part in the criminal prosecution" and "never discussed either the criminal or civil litigation with the press and was never quoted as having done so"). Carr, unlike Wolston and Gertz, voluntarily injected himself into the public debate by "attempt[ing] to influence the merits of [the] controversy." *Wells,* 186 F.3d at 537.

For example, in Apache Junction, Carr selected the team that would build the sewer project. He also chose the project's financiers, and therefore played a role in the sale of the bonds financing the project. Rather than being "dragged unwillingly into the controversy," *Wolston,* 443 U.S. at 166, 99 S.Ct. 2701, Carr voluntarily assumed a prominent public presence: he attended public meetings, spoke out in favor of the sewer project, wrote editorials for the local press, and was quoted in the local media, all in an effort "to engender public support" for the project. *See Fitzgerald,* 691 F.2d at 668 (promotional efforts for public venture through which plaintiff seeks pecuniary gain can be attempt to influence controversy).

Although the parties dispute the character of Carr's activity in South Carolina, it is uncontroverted that, at least behind the scenes, he managed the Southern Connector project in much the same way as he had managed the Apache Junction project. As the Senior Program Manager of Interwest Carolina, Carr was, according to the company's project proposal, a "key principal." Carr played a dominant role in building the Interwest Carolina team and creating the bid for the project. In so acting, Carr negotiated with South Carolina public officials. He also was instrumental in hiring Wilbur Smith to conduct the studies upon which Interwest Carolina's bid was based. If not the only force behind the project in South Carolina, Carr was clearly a strong and influential one.

In sum, instead of "play[ing] only a minor role" in the public controversy that gave rise to the assertedly defamatory statements, *Wolston,* 443 U.S. at 167, 99 S.Ct. 2701, Carr directed Interwest and managed all of the projects discussed in "Moonshine Bonds." *See Reuber,* 925 F.2d at 709 (prominence in a professional field may be sufficient to satisfy factors two and three). If those projects were based upon fraudulent estimates and studies (and we express no view on this), some of the responsibility rests with Carr. His acts created much of the controversy discussed in the article, and he voluntarily injected himself into much of the public imbroglio surrounding these projects.

Carr also satisfies the other three prongs of our five-factor test. The record before us demonstrates that Carr had access to channels of effective communication to rebut the allegations in the *Forbes* article. Indisputably, Carr's Interwest projects received substantial attention in the press. *See Reuber,* 925 F.2d at 708 (past publications concerning professional work of plaintiff is evidence of access to channels of effective communication). Moreover, Carr has often been quoted in media reports involving his Arizona projects, demonstrating his ability to obtain press coverage as to his views of the projects. Similarly, the South Carolina press quoted Interwest Carolina officials on the Southern Connector project and Interwest's connection to the Arizona projects. Although Carr himself was never quoted with respect to the South Carolina pro-

jects, he was a leader of the entity from which the media solicited quotes. Undoubtedly, the press would have reported Carr's views, over those of lesser officials, if he had made himself available.[2]

The remaining two prongs of our test are also easily satisfied. The controversy over Carr's projects clearly existed before the report in "Moonshine Bonds." Indeed, well before dissemination of that article, Allstate had sued Interwest for fraud, and that suit had received the attention of the press. Similarly, prior to the airing of "Moonshine Bonds," the advisability of the Southern Connector was publicly debated. Before the article was published, Allstate's suit against Interwest spurred South Carolina authorities to investigate Interwest, which in turn prompted media reports on that investigation. Finally, Carr also certainly maintained his public figure status at the time of the alleged defamation. When Forbes published "Moonshine Bonds" in July 1997, the Allstate suit was still pending and the Southern Connector project was ongoing. Therefore, we conclude that all five factors have been met, and that Carr's participation in the controversy surrounding the financial soundness of the Interwest companies' public projects sufficed to justify treating Carr as a limited-purpose public figure for purpose of comments arising out of that controversy.

## III.

Because Carr is a limited-purpose public figure, he can only recover in defamation if Forbes acted with actual malice in publishing "Moonshine Bonds." Proof of falsity is not enough; Carr must also demonstrate that Forbes "made the [false] statement with knowledge that it was false or with reckless disregard of whether it was false or not." *Reuber*, 925 F.2d at 714 (quoting *New York Times*, 376 U.S. at 280, 84 S.Ct. 710). Reckless disregard means "publishing with a high degree of awareness of . . . probable falsity." *Id.* (quoting *Garrison v. Louisiana*, 379 U.S. 64, 74, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964)). Establishing actual malice is no easy task, because the defamation plaintiff bears the burden of proof by clear and convincing evidence.[3] As an appellate court reviewing an order granting summary judgement, we must independently review the record to determine whether Carr has forecast evidence sufficient to prove actual malice by clear and convincing evidence. *See Bose Corp. v. Consumers Union, Inc.*, 466 U.S. 485, 514, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984).

Even assuming that at least some of the information in "Moonshine Bonds" is false, Carr cannot prevail because he has not forecast clear and convincing evidence that Forbes actually knew, or had a high

2. Of course, the Arizona and South Carolina media do not have the international readership of *Forbes* magazine. However, a court does not ask whether a defamation plaintiff has ever had access to a media outlet with the same size readership of the allegedly defamatory publication; such an inquiry would effectively prohibit widely read publications from ever commenting on local controversies. Our inquiry is rather whether the evidence demonstrates that the defamation plaintiff had access to channels of effective communication to respond to the allegedly defamatory statements. Carr clearly had such access.

3. Although acknowledging that the Supreme Court has denied statements of "opinion" blanket constitutional protection, *see Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 21, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990), Forbes also claims that Carr has failed to show actual malice because any potentially defamatory statements in the article are not actionable. Forbes argues that, as mere rhetorical hyperbole and opinion, these statements cannot objectively "be proved false." We need not address this contention because Carr has otherwise failed to demonstrate actual malice by clear and convincing evidence.

degree of awareness of, the probable falsity of anything in the article. Indeed, the record contains uncontroverted evidence that the Forbes reporter, Matthew Schifrin, conducted extensive research before he wrote the *Forbes* article. None of the material Schifrin collected put him on notice that any of the information in the article was false. Among other sources, Schifrin spoke with an Allstate attorney involved in the suit against Interwest, a public bond expert with a good reputation, a local activist opposed to the Southern Connector, and Carr himself. Schifrin also personally reviewed documents involved in the Southern Connector project, including Interwest Carolina's proposal.

Moreover, a Forbes employee meticulously fact-checked Schifrin's article. The fact checker's notes reveal that at least one source verified every statement in the article. In the face of this careful research, Carr does not point us to anything that should have put Forbes on notice as to the falsity of any statement in "Moonshine Bonds."

Carr essentially complains that Forbes should have investigated further before it published "Moonshine Bonds." According to Carr, "accepted standards of journalism" require this. Carr contends that, if these standards had been followed, Forbes would have learned that the article was altogether false. This may be true. However, "reckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing." *St. Amant v. Thompson*, 390 U.S. 727, 731, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968). "There must be sufficient evidence to permit the conclusion that the defendant *in fact* entertained serious doubts as to the truth of his publication." *Id.* (emphasis added).

Carr also contends that an anonymous editor added the article's most inflammatory statements without any knowledge of the facts. A review of the article from Schifrin's first draft, through the editing process, to the final draft, reveals that the language of the article did become more spirited and critical of Carr as editing progressed. However, Carr certainly has not pointed to any evidence that would prove clearly and convincingly that an editor made these changes out of whole cloth without consulting Schifrin's research. Indeed, it is undisputed that the fact-checker independently verified every fact in the final published version.

The *Forbes* article may contain false or misleading statements about Carr. The record before us certainly does not prove that Carr is a con-man or a criminal who enriched himself by defrauding bondholders in public-private partnership deals. He well may be an honest businessman who made some mistakes that those seeking to destroy his projects exploited. However, the First Amendment does not require perfection from the news media. Were the press subject to suit every time it erred, it would decline to speak out without resorting to the sort of cumbersome due diligence common in security offerings. For this reason, the Constitution provides the press with a shield whereby it may be wrong when commenting on acts of a public figure, as long as it is not intentionally or recklessly so.

## IV.

For all of these reasons, the judgment of the district court is

*AFFIRMED.*