**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

STEVEN J. HATFILL,
            *Plaintiff-Appellant,*

v.

THE NEW YORK TIMES COMPANY,
            *Defendant-Appellee,*

and

NICHOLAS KRISTOF,
                        *Defendant.*

---

AMERICAN BROADCASTING COMPANIES,
INCORPORATED; ALM MEDIA,
INCORPORATED; THE ASSOCIATED
PRESS; BLOOMBERG L.P.; CBS
BROADCASTING, INCORPORATED; COX
ENTERPRISES, INCORPORATED; DOW
JONES & COMPANY, INCORPORATED;
GANNETT COMPANY,
INCORPORATED; HEARST CORPORATION;
LANDMARK COMMUNICATIONS,
INCORPORATED; MAGAZINE
PUBLISHERS OF
AMERICA, INCORPORATED; NBC
UNIVERSAL, INCORPORATED;

No. 07-1124

NEWSPAPER ASSOCIATION OF AMERICA;
NEWSWEEK, INCORPORATED; THE
RADIO-TELEVISION NEWS DIRECTORS
ASSOCIATION; THE REPORTERS
COMMITTEE FOR FREEDOM OF THE
PRESS; TIME, INCORPORATED; THE
WASHINGTON POST COMPANY,
                    *Amici Supporting Appellee.*

STEVEN J. HATFILL,
                    *Plaintiff-Appellee,*

v.

THE NEW YORK TIMES COMPANY,
                    *Defendant-Appellant,*             No. 07-1162

and

NICHOLAS KRISTOF,
                    *Defendant.*

Appeals from the United States District Court
for the Eastern District of Virginia, at Alexandria.
Claude M. Hilton, Senior District Judge.
(1:04-cv-00807)

Argued: March 21, 2008

Decided: July 14, 2008

Before NIEMEYER and MICHAEL, Circuit Judges,
and C. Arlen BEAM, Senior Circuit Judge of the United States
Court of Appeals for the Eighth Circuit, sitting by designation.

Affirmed by published opinion. Judge Niemeyer wrote the opinion,
in which Judge Michael and Senior Judge Beam joined.

**COUNSEL**

**ARGUED:** Christopher J. Wright, HARRIS, WILTSHIRE & GRAN-NIS, L.L.P., Washington, D.C., for Steven J. Hatfill. Lee Levine, LEVINE, SULLIVAN, KOCH & SCHULZ, L.L.P., Washington, D.C., for The New York Times Company. **ON BRIEF:** Thomas G. Connolly, Mark A. Grannis, Timothy J. Simeone, Christopher P. Nierman, HARRIS, WILTSHIRE & GRANNIS, L.L.P., Washington, D.C., for Steven J. Hatfill. David A. Schulz, Michael D. Sullivan, LEVINE, SULLIVAN, KOCH & SCHULZ, L.L.P., Washington, D.C.; David E. McCraw, THE NEW YORK TIMES COMPANY, New York, New York, for The New York Times Company. Jack M. Weiss, Joshua Wilkenfeld, Laura M. Leitner, GIBSON, DUNN & CRUTCHER, L.L.P., New York, New York; Theodore J. Boutrous, Jr., GIBSON, DUNN & CRUTCHER, L.L.P., Washington, D.C., for Amici Curiae.

---

**OPINION**

NIEMEYER, Circuit Judge:

In the days and weeks following the 9/11 attacks on the World Trade Center and the Pentagon, someone sent letters laced with the deadly toxin anthrax through the U.S. mails to members of Congress and news organizations, and five people who handled the mail died from contact with the anthrax.

In the months that followed, Nicholas Kristof, a columnist whose articles appeared in the editorial section of *The New York Times*, criticized the FBI's investigation of the attacks as "lackadaisical" and "lethargic", "threaten[ing] America's national security," and, over a series of articles, Kristof began presenting evidence that pointed to Dr. Steven J. Hatfill, a biodefense research scientist, as a suspect. Even though Kristof acknowledged that by the time of his final article in August 2002, the FBI was improving, he demanded that the FBI either exculpate Dr. Hatfill or arrest him to "end this unseemly limbo."

Dr. Hatfill commenced this action against The New York Times Company, alleging that Kristof's columns were defamatory in that they "effectively" accused him of the crimes "in the mind of a reasonable reader." The district court granted The New York Times Company's motion for summary judgment, concluding that Dr. Hatfill was a "public official" or a "public figure" and that as a public official or public figure, he was required to demonstrate that The New York Times Company published the columns with "actual malice" in that it had knowledge that Kristof's columns were false or was reckless by disregarding whether they were false. Because Dr. Hatfill failed to demonstrate actual malice, the district court entered judgment for The New York Times Company.

On appeal, we affirm. Because Dr. Hatfill voluntarily thrust himself into the controversy surrounding the threat of bioterrorism and the nation's lack of preparedness for a bioterrorism attack, we agree with the district court's finding that he was a "limited-purpose public figure" and therefore was required to show actual malice. And because Dr. Hatfill did not demonstrate actual malice, the district court properly entered judgment in favor of The New York Times Company. We also conclude that Dr. Hatfill did not present evidence sufficient to prove intentional infliction of emotional distress.[1]

I

On September 18, 2001, and again on October 9, 2001, someone, who has not yet been identified, sent letters laced with the deadly toxin anthrax through the U.S. mails to members of Congress and news organizations. Five people who handled the mail died from contact with the anthrax. In addition, Congress was forced to close and the U.S. Postal Service was severely disrupted.

---

[1]The New York Times Company filed a conditional cross-appeal ("if . . . the judgment is reversed") from the district court's orders requiring it to disclose its confidential sources. Because we affirm the district court's summary judgment in favor of The New York Times Company on the merits, we do not reach the question of whether the district court acted contrary to law when it ordered The New York Times Company to disclose the identities of its confidential sources.

In response to these anthrax attacks, reporters began to discuss the nation's vulnerability to bioterrorism and its unpreparedness for a bioterrorist attack. They also began to criticize the slow investigation being conducted by the FBI into the attacks. Nicholas Kristof, a regular columnist in the editorial section of *The New York Times*, was one such writer.

In a series of five columns appearing in *The New York Times* from May 2002 to August 2002, which are fully described in our earlier opinion, *Hatfill v. N.Y. Times Co.*, 416 F.3d 320, 325-28 (4th Cir. 2005), Kristof used information provided by experts and other sources to profile a suspect in the attacks, ultimately focusing on Dr. Steven J. Hatfill, a biodefense research scientist. With each publication, Kristof identified new evidence suggesting Dr. Hatfill as a prime suspect. The columns noted that Dr. Hatfill had access to anthrax, had knowledge of how to make it, and had a motive. In the same columns, Kristof criticized the FBI for not investigating the facts against Dr. Hatfill. He characterized its investigation as "lackadaisical" and "unbelievably lethargic" and admonished that the FBI's investigatory attitude "continues to threaten America's national security." By August 13, 2002, however, when Kristof wrote his last column on this issue, he observed that the FBI had appreciably intensified its investigation, leading Kristof to conclude, "there is reason to hope that the bureau may soon be able to end this unseemly limbo by either exculpating Dr. Hatfill or arresting him."

Dr. Hatfill commenced this action against The New York Times Company ("The New York Times" or "The Times"), alleging claims under Virginia law for defamation, defamation per se, and intentional infliction of emotional distress. In Count I of his complaint, he alleged that The New York Times' "false and reckless public identification of Dr. Hatfill with the anthrax mailings, both directly and by implication from the manner in which his personal and professional background were presented in [Kristof's] columns, constituted a false factual allegation of terrorist and homicidal activity and impugned Dr. Hatfill's good name as a citizen, a physician and a bio-medical researcher to a reasonable reader." Count II alleged that each of eleven discrete factual misstatements in the five columns "constituted defamation per se, that, in the mind of the reasonable reader, would tend to incriminate Dr. Hatfill in the anthrax mailings." Finally, Count

III alleged that "Kristof's intentional public identification of Dr. Hat-fill with the anthrax murders" constituted intentional infliction of emotional distress.

The district court originally granted The New York Times' motion to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6), concluding that the complaint did not state a claim on which relief could be granted. On appeal, we reversed, finding that Kristof's columns were capable of defamatory meaning under Virginia law and that if defamatory, they could be sufficiently outrageous to rise to the level necessary for a finding of intentional infliction of emotional distress under Virginia law. *Hatfill*, 416 F.3d at 332-37.

During discovery after remand, Dr. Hatfill moved to compel The New York Times to disclose the identity of five confidential sources from whom Kristof allegedly obtained some of the information for his columns, and the district court granted the motion, after three of the sources had voluntarily revealed their identities. But The New York Times still refused to disclose the two unrevealed sources, and the district court sanctioned The Times. The court ordered that The Times could not refer to, rely on, or enter into evidence any information from those unrevealed sources.

Following the completion of discovery, the district court granted The New York Times' motion for summary judgment, concluding (1) that Dr. Hatfill was a "public official" and therefore had to demonstrate that The New York Times published the columns with "actual malice" — i.e., that The Times had knowledge that the columns were false or published them with reckless disregard of whether they were false; (2) that Dr. Hatfill was also a "limited purpose public figure" and therefore again had to show "actual malice"; and (3) that Dr. Hatfill had not shown that The New York Times' columns were published with knowledge that they were false or with reckless disregard of whether they were false. For similar reasons, the court also concluded that Dr. Hatfill could not succeed on his claim for intentional infliction of emotional distress.

From the district court's judgment in favor of The New York Times, dated January 30, 2007, Dr. Hatfill appeals, contending (1) that he is neither a public official nor a public figure; (2) that the evi-

dence in any event demonstrates actual malice; (3) that the evidence Dr. Hatfill advanced was sufficient to support his claim for intentional infliction of emotional distress; and (4) that the district court erred in granting summary judgment despite The Times' refusal to disclose Kristof's sources.

## II

We do not, on this appeal, address whether Dr. Hatfill presented evidence sufficient to prove his defamation claims under Virginia law. Rather, we address the dispositive issue of whether Dr. Hatfill was a "public official" or "public figure," requiring him to prove that The New York Times acted with "actual malice" in publishing the Kristof columns.

## A

As an accommodation to the First Amendment's protections of free speech and press, the Supreme Court has held that "public officials" and "public figures" must prove, as part of a defamation case, that the defendant's allegedly defamatory statement was made with "actual malice," meaning that it was made "with knowledge that it was false or with reckless disregard of whether it was false or not." *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 279-280 (1964) (as to a "public official"); *Curtis Publ'g Co. v. Butts*, 388 U.S. 130, 162 (1967) (Warren, C.J., concurring in the result) (as to a "public figure"); *see also Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 334-37, 342-43 (1974); *Foretich v. Capital Cities/ABC, Inc.*, 37 F.3d 1541, 1551 (4th Cir. 1994). Under this standard, it is not enough for a plaintiff to prove simply that the defendant failed to investigate or to check the accuracy of a false statement. *Gertz*, 418 U.S. at 332, 334-35 n.6. The standard requires that the defendant have a "subjective awareness of probable falsity" of the publication. *Id.* at 335 n.6 (citing *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968)). In addition, the element of "actual malice" must be proved by clear and convincing evidence. *Gertz*, 418 U.S. at 342; *Foretich*, 37 F.3d at 1551.

This compromise that limits a State's interest in preventing and redressing injuries to individuals' reputations in favor of society's interest in uninhibited, robust, and wide-open debate on public issues

recognizes that public officials and public figures[2] have "greater access to the channels of effective communication and hence have a more realistic opportunity to counteract false statements than private individuals normally enjoy. Private individuals are therefore more vulnerable to injury, and the state interest in protecting them is correspondingly greater." *Gertz*, 418 U.S. at 344 (footnote omitted). In addition, because public officials and public figures have generally chosen to enter the public arena, they have "voluntarily exposed themselves to increased risk of injury from defamatory falsehood concerning them. No such assumption is justified with respect to a private individual." *Id.* at 345.

Notwithstanding these generalities, the Supreme Court has subdivided the class of public figures for determining when public figures are subject to the actual malice standard. In *Gertz*, the Court explained that some public figures have assumed roles "of such persuasive power and influence that they are deemed public figures *for all purposes*." 418 U.S. at 345 (emphasis added). But more commonly, those who may be classed as public figures "have thrust themselves to the forefront of *particular public controversies* in order to

---

[2]A *public official* is one who has a *governmental role* and whose "position in government has such apparent importance that the public has an independent interest in the qualifications and performance of the person who holds it." *Rosenblatt v. Baer*, 383 U.S. 75, 86 (1966). Such interest must go "beyond the general public interest in the qualifications and performance of all government employees." *Id.* "An individual who decides to seek governmental office must accept certain necessary consequences of that involvement in public affairs. He runs the risk of closer public scrutiny than might otherwise be the case." *Gertz*, 418 U.S. at 344. For a public official, "society's interest . . . is not strictly limited to the formal discharge of official duties," but "extends to 'anything which might touch on an official's fitness for office,'" *id.* at 344-45 (quoting *Garrison v. Louisiana*, 379 U.S. 64, 77 (1964), and the Supreme Court has noted that "[f]ew personal attributes are more germane to fitness for office than dishonesty, malfeasance, or improper motivation, even though these characteristics may also affect the official's private character." *Garrison*, 379 U.S. at 77. A *public figure*, on the other hand, need not hold an important governmental office or serve an important governmental role. Public figures are persons who "have assumed roles of especial prominence in the affairs of society." *Gertz*, 418 U.S. at 345.

influence the resolution of the issues involved," and they are public figures *for only those limited purposes. Id.* (emphasis added). As the Court summarized:

> [The] designation [that one is a public figure] may rest on either of two alternative bases. In some instances an individual may achieve such pervasive fame or notoriety that he becomes a public figure *for all purposes and in all contexts.* More commonly, an individual voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure *for a limited range of issues.*

*Id.* at 351 (emphasis added); *see also Hutchinson v. Proxmire*, 443 U.S. 111, 134-36 (1979); *Wolston v. Reader's Digest Ass'n., Inc.*, 443 U.S. 157, 164-68 (1979); *Time, Inc. v. Firestone*, 424 U.S. 448, 454-55 (1976). Accordingly, we have stated that a public figure may be either (1) an "all-purpose public figure[ ]," who achieves "such pervasive fame or notoriety" that he becomes a public figure "for all purposes and in all contexts" or (2) a "limited-purpose public figure[ ]," who voluntarily injects himself "into a particular public controversy" and thereby becomes a public figure "for a limited range of issues." *Foretich*, 37 F.3d at 1551-52; *see also Wells v. Liddy*, 186 F.3d 505, 532 (4th Cir. 1999).[3]

Accordingly, in contrast to a public official or an all-purpose public figure, either of whom must always meet the actual malice standard, a "limited-purpose public figure," one who has "thrust [himself] to the forefront of *particular public controversies* in order to influence the resolution of the issues involved," *Gertz*, 418 U.S. at 345 (emphasis added), must show actual malice only when alleging defamation with regard to the particular controversy into which he has inserted himself.

---

[3]*Gertz* and *Foretich* also suggested that an additional type of public figure might be an "involuntary" public figure, one who obtains public figure status "through no purposeful action of his own." *Gertz*, 418 U.S. at 345; *Foretich*, 37 F.3d at 1551. But, as *Gertz* observed, the instances of classifying a person as an involuntary public figure would be "exceedingly rare." *Gertz*, 418 U.S. at 345.

The reasons for narrowing the protections of state defamation law for limited-purpose public figures give rise to factors that we have articulated for determining whether a plaintiff in a defamation case is a private person entitled to the full protection of state defamation law or a limited-purpose public figure entitled to only a narrowed protection. Under these factors, we focus on whether:

> (1) the plaintiff had access to channels of effective communication; (2) the plaintiff voluntarily assumed a role of special prominence in the public controversy; (3) the plaintiff sought to influence the resolution or outcome of the controversy; (4) the controversy existed prior to the publication of the defamatory statement; and (5) the plaintiff retained public-figure status at the time of the alleged defamation.

*Foretich*, 37 F.3d at 1553; *see also Carr v. Forbes, Inc.*, 259 F.3d 273, 280 (4th Cir. 2001); *Reuber v. Food Chem. News, Inc.*, 925 F.2d 703, 708-11 (4th Cir. 1991) (en banc); *Fitzgerald v. Penthouse Int'l, Ltd.*, 691 F.2d 666, 668 (4th Cir. 1982).

B

We now assess whether Dr. Hatfill was indeed a limited-purpose public figure, as the district court concluded.[4]

The record shows the following about Dr. Hatfill. After he graduated from medical school in Rhodesia (now Zimbabwe) and obtained a Master's degree in pathology in South Africa, he practiced medicine in South Africa. From South Africa, he returned to the United States where, in 1996, he received a research fellowship from the National Institutes of Health ("NIH") to study infectious diseases. At the NIH he became a respected figure within the U.S. bioterrorism community, giving public lectures and becoming involved in preparedness training for bioterrorist attacks.

---

[4]In addition to finding Dr. Hatfill to be a limited-purpose public figure, the district court held that he could alternatively qualify as both a public official and an involuntary public figure. We do not review these conclusions, however, as we rest our holding only on our finding that Dr. Hatfill was a limited-purpose public figure.

At the conclusion of his NIH fellowship, Dr. Hatfill obtained a fellowship from the National Research Council, a private organization, to study infectious diseases, particularly the Ebola virus, at the U.S. Army Medical Research Institute for Infectious Diseases at Ft. Detrick, Maryland. While at Ft. Detrick, Dr. Hatfill was given security clearance to work with Biosafety Level 3 pathogens, which include anthrax, plague, and monkeypox, and was vaccinated against anthrax. He was one of about 100 persons who had access to "wet" anthrax spores, which were kept in an unlocked closet at the site, but his official work at Ft. Detrick did not include working with anthrax.

During the course of his work at Ft. Detrick, Dr. Hatfill provided briefings to government officials and taught the military, intelligence, and law enforcement communities about biological weapons and preparedness for bioterrorist attacks. He was an instructor for both the CIA's Chemical and Biological Weapons Proliferation Course and the Defense Intelligence Agency's Joint Military Attache School. He briefed officials at the CIA, the Office of the Secretary of Defense, and the State Department about bioterrorism, and spoke about it at a conference sponsored by the Army War College. He also briefed, among others, the FBI's Joint Terrorism Task Force, the Assistant Secretary of Defense for Special Operations/Low Intensity Conflict, and the National Security Council. In this vein, he wrote a paper describing how the military could address bioterrorism, which he gave to the Commander at Ft. Detrick and the Special Operations/Low Intensity Conflict Officer at the Pentagon.

Dr. Hatfill also gave public speeches during this same period. For example, he gave a lecture at the Council on Foreign Relations on biological terrorism and made a presentation attended by the press on "Emerging Threats of Biological Terrorism." He also attended the Department of Defense's Worldwide Conference on Antiterrorism where, alongside other prominent bioterrorism experts, he spoke about biological weapons.

While at the NIH and Ft. Detrick, Dr. Hatfill acknowledged that "[t]he more I learned about biological warfare, the more alarmed I became about this potential threat," particularly in the context of "[s]everal anthrax hoaxes [that] had by then been described in the media." Accordingly, during this time, he increased his efforts to pub-

licize the threat from bioterrorism and became known in the scientific community for his warnings that the United States was unprepared for an attack. Colleagues described him as "a strong believer that there was a need to prepare against bioterrorism," and noted that "he was a kind of whistle blower of sorts in government on the issue."

When his fellowship for work at Ft. Detrick ended in January 1999, Dr. Hatfill took a job as Director of Biological Security Programs with Science Applications International Corporation ("SAIC"), another private company, but one receiving nearly 90% of its revenue from government-contracted work. While at SAIC, Dr. Hatfill developed a special biological warfare defense curriculum for the State Department; he upgraded course materials for the CIA; and he served as an expert or consultant on various government projects. He designed and gave classified lectures on biological weapons production to the CIA, the Defense Intelligence Agency, and Special Operations units of the armed forces. He also attended a classified lecture which described the process for producing powdered anthrax and on at least one occasion delivered a lecture himself on weaponizing anthrax.

After the September 11, 2001 attacks on the World Trade Center and the Pentagon, Dr. Hatfill led the SAIC team preparing recommendations for securing U.S. ports and harbors against biological threats, and went to work on other security-related government contracts. His supervisors at SAIC described him as "a national subject matter expert, whose opinions and technical advice [were] widely sought" in the area of bioterrorism, and noted that Dr. Hatfill had "an extensive network of contacts within the Department of Defense, the special operations community, and the Central Intelligence Agency."

In addition to the reputation he developed in carrying out his jobs, Dr. Hatfill spread his message through the media. In September 1999, Dr. Hatfill co-authored an article in the journal *Surgical Services Management* entitled "Answering the Chemical and Biological Warfare Threat," which urged the public health community to step up efforts to prepare for a chemical or biological attack. And in 2001, he submitted an article to his college alumni magazine, describing his career and identifying himself as "a specialist in biological warfare and its defense." The article included a photograph of him in a bio-

safety suit. He also wrote or called the media to volunteer his message on bioterrorism. For instance, following an anthrax scare at the B'nai B'rith headquarters in Washington, D.C., he called Armstrong Williams, a syndicated columnist, to offer "thoughts . . . on it." In April 1997, following a seminar on "Super Terrorism," he wrote a panelist, "I am tremendously interested in becoming more involved in this area and would like to volunteer my background, expertise and time, for whatever use these might be to the Terrorism Studies Program." Dr. Hatfill succeeded in appearing in news publications, magazines, books, and on television and radio programs on numerous occasions. He posed for a picture demonstrating how a determined terrorist could create biological weapons by "cooking up" plague in his own kitchen. The picture appeared in *Insight* magazine, and a commentary on the demonstration also appeared in *Quebec Science* magazine, in an editorial questioning Canada's preparedness for bioterrorist attacks. In addition, *Insight* magazine printed an article discussing the possibility of an anthrax attack at an airport, which included an interview with Dr. Hatfill, referring to him as a specialist in bioterrorism management. In 1996, Dr. Hatfill appeared on "Capital Ideas" with Rob Armstrong, a CBS News Radio program, to discuss topics related to his research, and in August 1999, he provided an interview to *The Washington Times* on the subject of bioterrorism and the threat of weaponized anthrax, noting that, in his opinion, the United States was unprepared for such an attack.

Following the anthrax attacks in the fall of 2001, Dr. Hatfill continued to appear publicly in the discussion of bioterrorism and the anthrax attacks. On October 1, 2001, four days before the first anthrax victim died, *The Washington Times* republished a 1997 article on bioterrorism featuring Dr. Hatfill, which included his observations about the release of anthrax in public buildings. He told ABC News that it was difficult to make anthrax and stressed that he thought the attacks were probably the work of international terrorists, even though he had earlier told a colleague that he could make dry powdered anthrax like that used in the attacks without access to a lab "because I know what I'm doing." During this period Dr. Hatfill sent a letter to three doctors discussing the characteristics of the mailed anthrax and describing his expertise regarding the use of anthrax as a biological weapon. And in February 2001, he was interviewed by a journalist with *The Baltimore Sun*, which quoted him (although not by name)

as saying that although he was one of "a bunch of people on [an FBI] list" of suspects based on a "profile" of the suspected anthrax mailer, he was "one of the good guys."

Apart from his voluntary efforts, the FBI investigation into the anthrax attacks drew wide attention to Dr. Hatfill. An FBI search of Dr. Hatfill's apartment was televised live and attracted extensive media coverage, and after Dr. Hatfill's home was searched, news agencies began printing stories about him. Dr. Hatfill characterized the press coverage that followed the search as a "media frenzy."

As the investigation continued, so did the media coverage increase. A friend described Dr. Hatfill to Wolf Blitzer in an interview on CNN as "kind of a whistle blower of sorts in government on the issue [of bioterrorism]. A lot of people didn't like what he was saying because it was uncomfortable, but he was trying to focus attention on the issue in a positive and constructive way." *Newsweek* magazine reported that bloodhounds exposed to scent packets preserved from the anthrax envelopes had reacted strongly to Dr. Hatfill's home, his girlfriend's home, his ex-girlfriend's home, and restaurants he had recently visited. During this time, Dr. Hatfill also had numerous voluntary meetings and contacts with reporters. He had dinner with Judith Miller of *The New York Times*, lunch with Tom Connolly and Ted Koppel of ABC News, and lunch with Jim Stewart and Mark Katov of CBS News. He also made formal public statements on the case and attended meetings with other journalists from *The Washington Post*, National Public Radio, *The Los Angeles Times*, NBC News, United Press International, and *The Washington Times*.

During these same months following the anthrax attacks, several media outlets (other than *The New York Times*) identified Dr. Hatfill by name as a prime suspect in the anthrax attacks. Only after other media so identified him did Kristof refer to him by name in his columns.

C

To determine whether Dr. Hatfill "thrust [himself] to the forefront" of the relevant controversy "to influence the resolution of the issues involved," *see Gertz*, 418 U.S. at 345 (defining a limited-purpose

public figure), we now turn to the five factors we identified for making the limited-purpose-public-figure determination, *see Foretich*, 37 F.3d at 1553.

First, on whether Dr. Hatfill had "access to channels of effective communication," it becomes readily apparent from the record that Dr. Hatfill was viewed as an expert on the topics of bioterrorism and biological weapons, including anthrax, and that he could command attention in this field. He was a frequent instructor of government agencies and personnel, had frequent meetings with journalists on the subject, and appeared on television, radio, and in print, both before and after the anthrax attacks occurred. Indeed, he was able, through two press conferences he convened, to refute "facts" written about him and to deny his involvement in the anthrax attacks. His access to channels of communication substantially exceeded those that we held sufficient in *Reuber*. In *Reuber*, we found that the plaintiff had testified before Congress and the Environmental Protection Agency; had given lectures on subjects related to the allegedly defamatory articles in which he was mentioned; had provided interviews to a newspaper; and had published several relevant scientific papers. *Reuber*, 925 F.2d at 708-09. If Reuber's access to channels of communication was sufficient, so too is Dr. Hatfill's.

The second and third factors — which, in *Reuber*, 925 F.2d at 709, we combined to inquire "'whether the plaintiff [had] voluntarily assumed a role of special prominence in a public controversy by attempting to influence the outcome of the controversy'" — represent the "heart of our five-factor test," *Carr*, 259 F.3d at 280 (quoting *Reuber*, 925 F.2d at 709). To determine whether these combined factors are satisfied, we first address the nature of the "particular public controversy" that gave rise to the alleged defamation to determine whether Dr. Hatfill thrust himself into *that* controversy. *See Gertz*, 418 U.S. at 345; *Foretich*, 37 F.3d at 1553-54.

Dr. Hatfill argues that we should interpret the words "particular public controversy" narrowly and therefore that the relevant public controversy is "who committed the anthrax attacks in 2001." With this limited definition of public controversy, he argues that he did not "voluntarily assume a role of special prominence," even if he had previously been vocal about bioterrorism. The New York Times, by con-

trast, argues that we have previously interpreted "particular public controversy" more broadly, explaining that the "use of the word 'particular' signifies only that a court must identify the specific or 'particular' controversy or controversies fairly addressed by the publication at issue before determining whether the plaintiff had voluntarily participated in the controversy so identified." The New York Times believes the particular public controversy in this case to be the debate on the threat from bioterrorism and the nation's lack of preparation for it, rather than the relatively narrow example of that threat exemplified by the specific anthrax mailings in 2001.

We agree with the view suggested by The New York Times. In light of the purpose of the public figure doctrine to encourage robust and uninhibited commentary on public issues, it stands to reason that we should look to the scope of the message conveyed in *The New York Times* through the articles that Dr. Hatfill is challenging. A fair reading of Kristof's columns reveals a debate about national security, the nation's lack of preparedness for bioterrorism, and the example provided by the FBI's investigation of the anthrax attacks in light of the evidence appearing against Dr. Hatfill. And, as Kristof stated in one of the early columns, the FBI's "lackadaisical attitude in pursuing the anthrax killer continues *to threaten America's national security*." (Emphasis added). As the FBI investigation continued to show FBI lethargy, Kristof said in a later column that "there are two larger issues." He pointed first to the FBI's slowness in carrying out the investigation and second to "the need for much greater care within the U.S. biodefense program." Finally, focusing on Dr. Hatfill as a recognized expert as well as a potential suspect, Kristof quoted Dr. Hatfill's response to an *earlier* anthrax scare in Washington, D.C., when Dr. Hatfill had stated, "As was evidenced in downtown Washington, D.C., a few hours later [after the false anthrax letters were received at the B'nai B'rith headquarters], this topic [bioterrorism] is vital to the security of the United States. I am tremendously interested in becoming more involved in this area." Kristof observed that Dr. Hatfill used the earlier incident "to underscore the importance of his field and his own status within it."

Thus, while focusing on solving the anthrax mailings of 2001, which prompted the larger debate, Kristof was, above all, concerned

about the government's efforts to protect the nation from a bioterrorist attack.

The discussion of a particularized threat within the context of a larger debate in this case is strikingly similar to the circumstances defining the "particular controversy" in *Fitzgerald v. Penthouse International, Ltd.* ("*Fitzgerald II*"), 691 F.2d 666 (4th Cir. 1982), which concerned the plaintiff's defamation action arising out of publication of an article on the military use of dolphins. Fitzgerald, the plaintiff and a self-proclaimed expert on the use of dolphins for military purposes, alleged that an article in *Penthouse* magazine was defamatory when it suggested that he may have disclosed "top secret" information related to the military use of dolphins to other countries. *Fitzgerald v. Penthouse Int'l, Ltd.* ("*Fitzgerald I*"), 639 F.2d 1076, 1079 (4th Cir. 1981). In *Fitzgerald II*, we held that, although the allegedly defamatory statements were the suggestions that Fitzgerald had disclosed secret information and that he had been involved in espionage by offering to sell dolphin torpedoes to other countries, the "particular public controversy" within which to analyze his status as a public figure was the larger controversy surrounding the military's use of dolphins, not the specific and narrow question of *who had leaked the information. See Fitzgerald II*, 691 F.2d at 668-69. Indeed, the situation in *Fitzgerald* — where an expert in a field claims defamation when a news publication later suggests he might have committed a crime relevant to that field — is almost identical to the circumstance in this case. Thus, just as we identified the particular public controversy in *Fitzgerald II*, we conclude in this case that the particular public controversy is the threat from bioterrorism and the nation's preparedness to handle that threat, with the anthrax attacks as the specific example that opened the debate to greater discussion.

It follows from the nature of the particular controversy that Dr. Hatfill "voluntarily assumed a role of special prominence" in the controversy. And he did so in an attempt "to influence the resolution of the controversy." *Reuber*, 925 F.2d at 709. Throughout his career, Dr. Hatfill was not only repeatedly sought out as an expert on bioterrorism, but was also a vocal critic of the government's unpreparedness for a bioterrorist attack, as evidenced by the topics of his lectures, writings, participation on panels, and interviews. Through these

media, Dr. Hatfill voluntarily thrust himself into the debate. He cannot remove himself now to assume a favorable litigation posture.

The last two factors are also indisputably satisfied in this case. The particular public controversy surely existed prior to the publication of the allegedly defamatory statements. The controversy over the nation's preparedness for bioterrorist attack existed years before *The New York Times* published Kristof's columns, and it was this very topic on which Dr. Hatfill centered his entire career. In addition, the controversy heightened with the investigation into the anthrax attacks themselves, which began in the fall of 2001, more than six months before Kristof's columns appeared, and Dr. Hatfill himself used the attacks as a platform from which to intensify his message about national unpreparedness, thus satisfying the final requirement — that he "retained public-figure status at the time of the alleged defamation." *Foretich*, 37 F.3d at 1553.

We therefore conclude that Dr. Hatfill meets the criteria for classification as a public figure for the limited purpose of the controversy regarding the bioterrorism threat and the nation's preparedness for a bioterrorist attack, with the anthrax attacks as but an example of that controversy.

## III

As a limited-purpose public figure, Dr. Hatfill had to show, in order to prevail on his defamation claim, that The New York Times acted with actual malice in publishing the challenged columns, meaning that the alleged defamatory statements had to be made with knowledge that they were false or with reckless disregard of their falsity, *i.e.*, with a "high degree of awareness of [their] probable falsity." *Reuber*, 925 F.2d at 714 (quoting *Garrison*, 379 U.S. at 74). Moreover, he had to "forecast evidence sufficient to prove actual malice by *clear and convincing* evidence." *Carr*, 259 F.3d at 282 (emphasis added). Dr. Hatfill did not make that showing.

In both counts for defamation, Dr. Hatfill asserted that Kristof's columns, as well as isolated statements within them, conveyed a specific defamatory meaning — the strong suggestion that Dr. Hatfill was the anthrax mailer and therefore that he was a terrorist who com-

mitted murder. Therefore, to show actual malice Dr. Hatfill had to show by clear and convincing evidence that Kristof either knew of the falsity of this suggestion, i.e., he knew Dr. Hatfill did not commit the anthrax mailings, or that Kristof had a "high degree of awareness" of its probable falsity, again that Dr. Hatfill did not commit the anthrax mailings. From our careful review of the record, we conclude that Dr. Hatfill did not satisfy this burden.

Indeed, the record contains substantial evidence to support The New York Times' contention that Kristof *actually believed* that Dr. Hatfill was the prime suspect. At the time that Kristof wrote his columns, he knew from several sources that Dr. Hatfill fit the profile that the FBI had developed and that he had been identified specifically by the FBI as a suspect who should be investigated carefully. In conducting research for his columns, Kristof had reviewed many previously published articles about Dr. Hatfill, which recounted that he had been questioned by the FBI more than once; that he had voluntarily vaccinated himself against anthrax shortly before the mailings; that he had access to labs where anthrax was stored; that he had knowledge about anthrax's use as a weapon; that he had strong views about the bioterrorism threat; that he had agreed that his "background naturally drew the FBI's attention"; that he had spoken frequently about possible bioterrorism; and that he lost his security clearance after he failed a polygraph test shortly before the mailings. In addition, Kristof reviewed numerous documents, including Dr. Hatfill's resume and various reports, papers, and letters written by him describing his knowledge of bioterrorism and biological weapons.

With these undisputed facts, no reasonable jury could find that Kristof had a "high degree of awareness" that Dr. Hatfill was *not* the anthrax mailer. *Garrison*, 379 U.S. at 74. As the district court found, the evidence in this case "*at best*" reveals that Kristof "did not know whether or not [Dr. Hatfill] was the anthrax mailer, but did believe that [Dr. Hatfill] was someone that [the] FBI should investigate more thoroughly." (Emphasis added).

Dr. Hatfill contends that because Kristof was warned that one of his main sources, Dr. Barbara Rosenberg, was untrustworthy, and yet still published his columns, we should find actual malice. But Dr. Rosenberg was considered an expert in the field of biological weap-

ons and had been called upon by the FBI to discuss the anthrax investigation. Given Dr. Rosenberg's background, there is no reason that Kristof's reliance on her statements constitutes actual malice, even given the expressed disagreement of others with regard to her opinions. Constitutional malice requires "much more than a failure to exercise ordinary care" — it demands evidence of the "publication of a *completely* fabricated story, or of one based entirely on an unverified anonymous telephone call; or publication where there are obvious reasons to doubt the veracity of the informant." *Ryan v. Brooks*, 634 F.2d 726, 732 (4th Cir. 1980) (emphasis added) (citing *St. Amant*, 390 U.S. at 732). Such was not the case here. We agree with the district court's conclusion that "based on all the information he had gathered, Mr. Kristof had no reason to seriously doubt that [Dr. Hatfill] could have been the anthrax mailer."

The allegations in Count II, listing discrete statements alleged to be false, do not improve Dr. Hatfill's arguments, because at bottom, Dr. Hatfill still maintains that the discrete false statements in the columns constituted defamation because they *"tend[ed] to incriminate Dr. Hatfill in the anthrax mailings."* (Emphasis added). This is the same defamatory message allegedly conveyed by the columns as a whole, as alleged in Count I.

Accordingly, we affirm the district court's judgments on Counts I and II.

IV

Dr. Hatfill also contends that the district court erred in granting summary judgment on his claim for intentional infliction of emotional distress.

Under Virginia law, to recover for intentional infliction of emotional distress, Dr. Hatfill had to prove that (1) "the wrongdoer's conduct was intentional or reckless"; (2) "the conduct was outrageous and intolerable"; (3) "there was a causal connection between the wrongdoer's conduct and the emotional distress"; and (4) "the emotional distress was severe." *Womack v. Eldridge*, 210 S.E.2d 145, 148 (Va. 1974). When we had this case on the first appeal and reinstated Dr. Hatfill's claim for intentional infliction of emotional distress, we rec-

ognized that "if Dr. Hatfill "ultimately [could not] prevail on his defamation claims because he [was] unable to satisfy [the] constitutional requirements for recovery, then he likely [would] be unable to prove that The Times' misconduct was intentional or reckless or that such misconduct was sufficiently outrageous to warrant recovery" for intentional infliction of emotional distress. *Hatfill*, 416 F.3d at 336-37.

On remand, the district court concluded that because Dr. Hatfill "failed to satisfy his burden of showing" that The New York Times "act[ed] with malice when it published Kristof's columns," he also had failed to produce enough evidence to be able to convince a reasonable jury that The New York Times had either "intentionally or recklessly caused him severe emotional distress" or that its conduct was otherwise "sufficiently outrageous" to support liability for intentional infliction of emotional distress. We agree and affirm the district court's conclusion.

V

Finally, as an overarching claim, Dr. Hatfill contends that the district court erred in granting summary judgment to The New York Times in light of The Times' refusal to comply with the district court's order that it disclose its sources. We find the argument unpersuasive.

Dr. Hatfill's argument is based on a non sequitur. Simply because The New York Times refused to comply with the district court's order that it disclose its sources does not mean that The Times was precluded an award of summary judgment. The district court, in its discretion, sanctioned The Times for refusing to comply with the order, precluding it from referring to, relying on, or entering into evidence the existence of the two confidential sources that were not disclosed or the information they provided to Kristof. Dr. Hatfill does not suggest that The New York Times' motion for summary judgment violated that sanction.

Thus, Dr. Hatfill can only be challenging the adequacy of the sanction itself. But the district court exercised its discretion to impose a penalty that would "ameliorate [the] prejudice" to Dr. Hatfill "without

resorting to overly drastic measures given the nature of this case," and therefore restricted The Times' ability to refer to the sources for evidence. We conclude that the sanction imposed by the district court did not amount to an abuse of discretion, and therefore we reject Dr. Hatfill's argument. *See Southern States Rack & Fixture, Inc. v. Sherwin-Williams Co.*, 318 F.3d 592, 595 (4th Cir. 2003) (noting standard of review).

The judgment of the district court is accordingly

*AFFIRMED*.