**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 20-1298**

JUSTIN E. FAIRFAX,

        Plaintiff - Appellant,

   v.

CBS CORPORATION; CBS BROADCASTING INC.,

        Defendants - Appellees.

**No. 20-1299**

JUSTIN E. FAIRFAX,

        Plaintiff - Appellee,

   v.

CBS CORPORATION; CBS BROADCASTING INC.,

        Defendants - Appellants.

Appeals from the United States District Court for the Eastern District of Virginia, at Alexandria.  Anthony J. Trenga, Senior District Judge.  (1:19-cv-01176-AJT-MSN)

Argued:  March 11, 2021                         Decided:  June 23, 2021

Before KEENAN, QUATTLEBAUM, and RUSHING, Circuit Judges.

Affirmed by published opinion. Judge Rushing wrote the opinion, in which Judge Keenan and Judge Quattlebaum joined.

―――――――――

**ARGUED:** Tillman J. Breckenridge, BRECKENRIDGE PLLC, Washington, D.C., for Appellant/Cross-Appellee. Jay Ward Brown, BALLARD SPAHR LLP, Washington, D.C., for Appellees/Cross-Appellants. **ON BRIEF:** Matthew E. Kelley, BALLARD SPAHR LLP, Washington, D.C., for Appellees/Cross-Appellants.

―――――――――

RUSHING, Circuit Judge:

In April 2019, the television news program *CBS This Morning* broadcast interviews with two women who accused Justin Fairfax, the Lieutenant Governor of Virginia, of sexual assault. Fairfax denied the allegations and subsequently sued CBS Corporation and CBS Broadcasting, Inc. (collectively, CBS) for defamation and intentional infliction of emotional distress. The district court granted CBS's motion to dismiss the complaint in its entirety but denied CBS's motion for attorney's fees and costs. The parties now appeal, and we affirm the district court in both respects. Specifically, Fairfax's complaint fails to plausibly allege that CBS made the allegedly defamatory statements with knowledge or reckless disregard of their falsity, as required to state a claim for defamation of a public official. And the relevant fee-shifting statute by its plain terms is discretionary, not mandatory or presumptive. We therefore must affirm.

I.

The following facts, taken from Fairfax's amended complaint and the CBS broadcasts referenced therein, are assumed to be true for purposes of this appeal. *See E.I. du Pont de Nemours and Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 448 (4th Cir. 2011).

National attention turned to Virginia Lieutenant Governor Justin Fairfax in February 2019, when it appeared that Virginia Governor Ralph Northam might resign after an offensive photograph from his medical school yearbook surfaced. Under Virginia law, the lieutenant governor replaces a sitting governor who resigns. Va. Const. art. V, § 16.

Shortly after the Northam photo surfaced, a news website published a private Facebook message written by Vanessa Tyson, alleging that someone poised to receive a

3

"VERY BIG promotion" in Virginia had sexually assaulted her at the 2004 Democratic National Convention. J.A. 72. National mainstream media outlets reported the allegation the next day, including *The Washington Post*, which noted that it could not corroborate Tyson's allegation. On February 6, Tyson issued a public statement asserting that Fairfax was the man who sexually assaulted her in 2004. She alleged that what began as a consensual encounter turned into sexual assault when Fairfax forced her to perform a sex act against her will. Tyson called for Fairfax to resign his position as lieutenant governor and for the Virginia General Assembly to conduct a hearing into the matter.

Two days later, Meredith Watson publicly alleged that Fairfax raped her in 2000 while they were undergraduate students at Duke University. Watson subsequently added that a Duke athlete had raped her during the 1998–1999 academic year and a Duke official had discouraged her from reporting it. According to Watson, at a campus party later in 2000 she asked Fairfax why he assaulted her, to which he responded, "I knew that because of what happened to you last year, you'd be too afraid to say anything." J.A. 82. Watson also called for hearings to investigate Fairfax's conduct.

Fairfax adamantly denied both women's allegations. Although he admitted that both sexual encounters occurred, he claimed they were entirely consensual and he did not force either woman to do anything. Needless to say, the allegations and Fairfax's response generated significant publicity.

The day Watson's story broke, Ed O'Keefe, a CBS News Political Correspondent, was in contact with Fairfax's spokesperson. The spokesperson sent O'Keefe a list of names and phone numbers, saying "Please Ed call these Duke grads." O'Keefe responded: "We

4

are calling the friends and nobody is answering. Urge them to call back." J.A. 85. O'Keefe also noted that one of the individuals was apparently an attorney for CBS. Over the following days and weeks, CBS reporting staff were in regular contact with Fairfax's spokesperson and were highly responsive to her outreach. After learning that CBS intended to broadcast interviews with Tyson and Watson, Fairfax's spokesperson contacted CBS journalist Gayle King, urging her to ask Watson questions such as, "What exactly happen[ed] that day, where, when, did you see anyone else on your way in or out?" and "Why are you willing to speak in public but not speak to the Durham police/DA regarding two rape allegations[?]" J.A. 92–93.

On April 1 and 2, *CBS This Morning* aired its interviews with Tyson and Watson, who were interviewed separately by host Gayle King. The April 1 broadcast featured Tyson's interview, during which she described in detail her allegation that Fairfax sexually assaulted her in his hotel room in 2004. King posed questions throughout the interview, including asking Tyson why she did not report the incident. Immediately after the recorded interview segments, King read from a statement Fairfax had given CBS denying the allegations. King directed viewers to Fairfax's full statement on CBS's website and stated, "[w]e are hoping that Lieutenant Governor Fairfax will speak to us at some point." J.A. 145. Then King and her co-hosts shared their reactions to the interview, saying among other things, "I felt at some point it's almost like she's going back to the moment that she believed"; "[s]omething clearly changed when she was walking . . . through what transpired"; and "[y]eah, feels like she was forced." J.A. 139–140. The co-hosts also observed, "that pain has stuck with them about how they felt in that moment and how it

5

has affected them now for decades" and "we have now seen example after example of how it is as real as if it happened yesterday." J.A. 145–146.

The April 2 broadcast featured Watson's interview, in which she recounted her allegation that Fairfax raped her in a dorm room at Duke University in 2000 and later told her that he had done so because he knew, based on the sexual assault she suffered the previous year, that she would be too afraid to do anything about it. King again posed questions throughout the interview, including asking Watson about reports regarding her personal life that implicated her credibility. After the interview segments, King read from a statement Fairfax provided CBS denying the allegations. King also reported that, according to his spokesperson, Fairfax had taken a polygraph test that supported his denials. Regarding Watson's allegations about the Duke athlete, King reported that the athlete denied the allegations and Duke claimed to have first learned of them in February 2019. King noted that both Tyson and Watson sought a legislative hearing instead of a criminal investigation because they claimed investigation results could be kept private, whereas a hearing would be public.

In July 2019, Fairfax issued a public letter to a district attorney in North Carolina, alleging for the first time the existence of an eyewitness to the events underlying Watson's allegations. Shortly thereafter, Fairfax demanded that CBS retract the interviews, and CBS refused.

Fairfax then sued CBS in district court, asserting defamation and intentional infliction of emotional distress under Virginia law. CBS moved to dismiss the complaint for failure to state a claim and sought attorney's fees and costs. The district court granted

6

the motion to dismiss and denied the motion for fees. Both parties appealed, and we have jurisdiction pursuant to 28 U.S.C. § 1291.

II.

"We review de novo the grant of a motion to dismiss for failure to state a claim," applying the same standards as the district court. *Garnett v. Remedi Seniorcare of Va., LLC*, 892 F.3d 140, 142 (4th Cir. 2018) (internal quotation marks omitted). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see also* Fed. R. Civ. P. 12(b)(6). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. Conclusory statements and facts "merely consistent with a defendant's liability" do not suffice to carry a complaint over "the line between possibility and plausibility." *Id.* (quoting *Twombly*, 550 U.S. at 557). In evaluating a complaint at this stage, a court also may consider documents integral to and relied upon in the complaint, such as the two *CBS This Morning* broadcasts at issue here, so long as the plaintiff does not question their authenticity, which Fairfax does not. *Phillips v. LCI Int'l, Inc.*, 190 F.3d 609, 618 (4th Cir. 1999).

To state a claim for defamation under Virginia law, a plaintiff must plead (1) publication of (2) an actionable statement—that is, a statement that is both false and defamatory—with (3) the requisite intent. *Schaecher v. Bouffault*, 772 S.E.2d 589, 594 (Va. 2015) (quoting *Tharpe v. Saunders*, 737 S.E.2d 890, 892 (Va. 2013)); *see also* Va.

7

*Citizens Def. League v. Couric*, 910 F.3d 780, 783 (4th Cir. 2018). The necessary intent "depends, in part, on whether a plaintiff is a public or private figure." *Jackson v. Hartig*, 645 S.E.2d 303, 308 (Va. 2007); *see also Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 344–347 (1974); *Curtis Pub. Co. v. Butts*, 388 U.S. 130, 134 (1967); *New York Times Co. v. Sullivan*, 376 U.S. 254, 279–280 (1964). Because Fairfax is admittedly a public official, he may seek redress for the allegedly defamatory statements only if CBS published the statements with "actual malice." *New York Times*, 376 U.S. at 279–280. "Actual malice" is a legal term of art; in this context, it does not mean ill will or intent to injure but rather that the defendant made the defamatory statement "with knowledge that it was false or with reckless disregard of whether it was false or not." *Id.*; *see also Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 666 (1989).

The freedom of speech guaranteed by the First and Fourteenth Amendments requires this heightened intent standard in defamation actions brought by public officials, the Supreme Court has reasoned, "to insure the ascertainment and publication of the truth about public affairs." *St. Amant v. Thompson*, 390 U.S. 727, 732 (1968); *see also CACI Premier Tech., Inc. v. Rhodes*, 536 F.3d 280, 293 (4th Cir. 2008). Defamatory falsehoods are of no social value, yet we must tolerate and even shield some erroneous publications in the realm of public affairs because "the stake of the people in public business and the conduct of public officials is so great that neither the defense of truth nor the standard of ordinary care would protect against self-censorship and thus adequately implement First Amendment policies." *St. Amant*, 390 U.S. at 731–732; *see also New York Times*, 376 U.S. at 279 ("A rule compelling the critic of official conduct to guarantee the truth of all his

factual assertions—and to do so on pain of libel judgments virtually unlimited in amount—leads to . . . 'self-censorship.'"); *Ryan v. Brooks*, 634 F.2d 726, 733 (4th Cir. 1980). This rule "protects the paramount public interest in a free flow of information to the people concerning public officials," and "anything which might touch on an official's fitness for office is relevant," even though it may also concern "the official's private character." *Garrison v. Louisiana*, 379 U.S. 64, 77 (1964); *see also Gertz*, 418 U.S. at 344–345 ("[S]ociety's interest in the officers of government is not strictly limited to the formal discharge of official duties.").

Only a knowing or reckless falsehood, therefore, will provide grounds for a public official to seek compensation for defamation. Accordingly, "[a]ctual malice is a subjective standard." *Reuber v. Food Chem. News, Inc.*, 925 F.2d 703, 714 (4th Cir. 1991) (en banc); *see also Horne v. WTVR, LLC*, 893 F.3d 201, 211 (4th Cir. 2018). A plaintiff must prove that the defendant published the statement despite actually knowing it was false or harboring "a 'high degree of awareness of . . . probable falsity.'" *Reuber*, 925 F.2d at 714 (alteration in original) (quoting *Garrison*, 379 U.S. at 74). This standard "requires 'much more than a failure to exercise ordinary care.'" *Hatfill v. New York Times Co.*, 532 F.3d 312, 325 (4th Cir. 2008) (quoting *Ryan*, 634 F.2d at 732). Recklessness "is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing." *St. Amant*, 390 U.S. at 731; *see also CACI Premier Tech.*, 536 F.3d at 300. Rather, a plaintiff must prove that "the defendant in fact entertained serious doubts as to the truth of his publication." *St. Amant*, 390 U.S. at 731. Of course, here we review a motion to dismiss; the evidence is not yet in. We accordingly must evaluate whether

9

Fairfax in his amended complaint alleged facts that, if proven, create a plausible inference that CBS aired the broadcasts with knowledge or reckless disregard of their falsity. *See Mayfield v. Nat'l Ass'n for Stock Car Auto Racing, Inc.*, 674 F.3d 369, 377 (4th Cir. 2012) ("[T]he usual standards of notice pleading apply in defamation cases." (quoting *Hatfill*, 416 F.3d at 329)); *cf. Harte-Hanks*, 491 U.S. at 668 ("[A] plaintiff is entitled to prove the defendant's state of mind through circumstantial evidence.").

Fairfax does not allege that CBS broadcast the April 1 and 2 programs actually knowing that either Tyson's or Watson's allegation of sexual assault was false. To plead actual malice, therefore, Fairfax must plausibly allege that CBS aired the broadcasts with a "high degree of awareness" that Fairfax likely did *not* sexually assault Tyson or Watson. *Garrison*, 379 U.S. at 74; *see also Hatfill*, 532 F.3d at 325. Fairfax attempts to meet this standard with allegations intended to show that CBS failed to investigate the women's accounts despite reason to question their credibility. "Failure to investigate does not in itself establish bad faith." *St. Amant*, 390 U.S. at 733; *see also Harte-Hanks*, 491 U.S. at 688 ("[F]ailure to investigate before publishing, even when a reasonably prudent person would have done so, is not sufficient to establish reckless disregard."). However, failure to investigate before reporting a third party's allegations can be reckless "where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports." *Harte-Hanks*, 491 U.S. at 688 (quoting *St. Amant*, 390 U.S. at 732); *see also id.* at 692 ("Although failure to investigate will not alone support a finding of actual malice, the purposeful avoidance of the truth is in a different category." (internal citation omitted)); *CACI Premier Tech.*, 536 F.3d at 300.

10

Fairfax claims CBS had obvious reasons to doubt Tyson's and Watson's veracity and yet failed to investigate their accusations or shielded itself from the truth. But the amended complaint fails to allege facts that make these contentions plausible. As to Tyson's credibility, Fairfax alleges CBS knew that: Tyson had spoken publicly about another experience with sexual assault but had never previously mentioned Fairfax; Tyson's story was politically motivated; and *The Washington Post* was initially unable to corroborate Tyson's allegation. Tyson's previous reticence to publicly report the encounter with Fairfax, and her alleged political motivation for disclosing when she did, do not make her allegations so obviously doubtful that CBS was reckless in reporting them. As we have observed, self-interest and politics "motivate[] many news sources; if dealing with such persons were to constitute evidence of actual malice on the part of a reporter, much newsgathering would be severely chilled." *Reuber*, 925 F.2d at 715. That *The Washington Post* could not initially corroborate Tyson's story because she had not told anyone what happened similarly does not suggest that, months later, CBS actually held serious doubts about her veracity. Indeed, Fairfax himself confirmed to CBS that this sexual encounter with Tyson occurred, albeit consensually.

Regarding Watson's account, Fairfax alleges: King did not ask Watson the interview questions provided by Fairfax's spokesperson; O'Keefe did not get information from the Duke friends whom Fairfax's spokesperson identified, including the CBS lawyer on the list; CBS knew Duke University denied being aware before February 2019 of Watson's allegation of rape by a Duke athlete; and CBS knew that Watson (and Tyson) wanted a public hearing instead of a law enforcement investigation. These allegations do

11

not raise an inference that CBS "entertained serious doubts as to the truth" of Watson's accusation or deliberately attempted to avoid learning the truth. *St. Amant*, 390 U.S. at 731. Fairfax alleges that CBS reporting staff were "in regular touch" with his spokesperson and "highly responsive to her outreach." J.A. 106. He alleges that O'Keefe told the spokesperson CBS had attempted to contact the individuals Fairfax identified and asked Fairfax and his team to urge those individuals to speak with CBS reporters. The interview demonstrates that King questioned Watson (and Tyson) about her version of events, including questions probing her veracity and motivations. In the broadcasts, King explicitly noted that both women called for a public hearing instead of an investigation and that Duke denied knowing about Watson's allegation regarding the Duke athlete when she was a student, although she claimed to have reported it to a Duke official at the time. These are not the actions of reporters avoiding the truth so as to present a story they believe to be false.

Fairfax places great emphasis on the list of Duke friends his spokesperson supplied CBS and the suggestion that King should ask Watson whether she saw "anyone else on [her] way in or out" the evening of the alleged assault. According to Fairfax, the eyewitness to his encounter with Watson was on the list provided to CBS, and the CBS attorney on the list was aware of the eyewitness. If CBS had interviewed either person or had asked Watson whether anyone else was present during the alleged assault, Fairfax claims CBS would have discovered the truth. Critically, however, Fairfax did not disclose the existence of the eyewitness until July, months after CBS broadcast Watson's interview. Nor does he allege that the journalists responsible for the *CBS This Morning* broadcast knew about the

12

eyewitness from any other source. *See New York Times*, 376 U.S. at 287 ("[T]he state of mind required for actual malice would have to be brought home to the persons in the Times' organization having responsibility for the publication of the [allegedly defamatory] advertisement."). He therefore has not alleged that CBS had any reason, at the time of the alleged defamatory statements, to believe that an eyewitness existed or to understand the significance of asking whether Watson saw anyone else that evening. This is not a case like *Harte-Hanks*, where journalists failed to make any effort to interview a *known* key witness to the event that was the subject of the report. *See* 491 U.S. at 682, 692. To the contrary, Fairfax has alleged that he revealed the existence of an eyewitness for the first time *after* the CBS broadcast. We cannot infer any bad faith on the part of CBS for failing to more vigorously pursue a third party for information when, at the time of the broadcast, it had no reason to believe that third party witnessed the relevant event.

Nor does CBS's alleged refusal to correct or retract its story after Fairfax's subsequent revelation push his actual malice claim over the line of plausibility. The actual malice standard requires that "the defendant had a particular, subjective state of mind at the time the statements were made." *Horne*, 893 F.3d at 211; *see New York Times*, 376 U.S. at 286 (assessing malice "at the time of the publication"). CBS's alleged post-publication conduct here is not probative of its state of mind at the time of publication, before it was aware of the alleged eyewitness.

Finally, Fairfax also alleges: CBS did not inform him about the interviews or request his response to them; CBS had motive to show itself sympathetic to allegations of sexual assault after CBS personalities had been accused of sexual misconduct; and CBS

13

"resurrected" the stories two months after the allegations were first made. Even considered together with the aforementioned allegations, these assertions fail to support Fairfax's claim of actual malice. As the broadcasts show, CBS received a formal statement from Fairfax denying Tyson's and Watsons' accusations—King communicated Fairfax's denial and quoted from his statement at multiple points during the two broadcasts. CBS's alleged failure to more specifically inform Fairfax about the interviews accordingly does not suggest CBS was attempting to avoid learning or communicating the truth. As for CBS's alleged motive to salvage its own reputation, a news organization's "motive in publishing a story . . . cannot provide a sufficient basis for finding actual malice." *Harte-Hanks*, 491 U.S. at 665; *see also Reuber*, 925 F.2d at 716 ("[E]vidence of a defendant [publishing] material to increase its profits does not suffice to prove actual malice."). Even accepting as true that CBS had a self-serving motive in pursuing the story—and accepting that motive can be relevant to the actual malice inquiry, *see Harte-Hanks*, 491 U.S. at 668—that does not support an inference that CBS seriously doubted the truth of the women's accusations against Fairfax. Nor does the fact that CBS broadcast the exclusive interviews two months after the initial allegations at all suggest CBS acted with a "high degree of awareness of [the accusations'] probable falsity." *Hatfill*, 532 F.3d at 324 (quoting *Reuber*, 925 F.2d at 714); *see also Garrison*, 379 U.S. at 74.

At bottom, the factual allegations in Fairfax's amended complaint fall considerably short of plausibly alleging that CBS broadcast its April 1 and 2 *CBS This Morning* programs despite entertaining "serious doubts as to the truth" of those broadcasts. *St. Amant*, 390 U.S. at 731. Fairfax vigorously disputes the accusations made by Tyson and

14

*Watson*, and we express no opinion on the truth or falsity of their claims. But even accepting Fairfax's version of events, he has alleged nothing to suggest that CBS reported the women's stories with knowledge or reckless disregard of their falsity. Fairfax must be content with "[t]he first remedy of any victim of defamation"—efforts to contradict and counteract the allegedly false accusations—and the "significantly greater access to the channels of effective communication" afforded him as a public official. *Gertz*, 418 U.S. at 344.

Because Fairfax has not sufficiently alleged actual malice, he has failed to state a claim for defamation and we need not consider the other elements of this cause of action, including defamatory meaning. And as Fairfax acknowledges, our analysis of his failure to sufficiently plead actual malice applies equally to his claim for intentional infliction of emotional distress. *See Russo v. White*, 400 S.E. 2d 160, 162 (Va. 1991) (listing the elements of a claim for intentional infliction of emotional distress in the absence of a "tactile tort"); *Hatfill*, 532 F.3d at 325–326; *cf. Harte-Hanks*, 491 U.S. at 667; *Hustler Mag., Inc. v. Falwell*, 485 U.S. 46, 56 (1988).

## III.

We turn now to CBS's cross-appeal of the district court's denial of its request for attorney's fees. The district court held that CBS sufficiently established its entitlement to statutory immunity under Virginia Code Ann. § 8.01-223.2, Virginia's anti-SLAPP (strategic lawsuit against public participation) statute. Generally speaking, anti-SLAPP statutes aim to weed out and deter lawsuits brought for the improper purpose of harassing individuals who are exercising their protected right to freedom of speech. *See Henry v.*

15

*Lake Charles Am. Press, LLC.*, 566 F.3d 164, 169 (5th Cir. 2009). Virginia's statute provides, among other things, that "[a]ny person who has a suit against him dismissed or [a subpoena quashed] pursuant to the immunity provided by this section may be awarded reasonable attorney fees and costs." Va. Code Ann. § 8.01-223.2(B). The district court reasoned that an award pursuant to this provision is permissive, not mandatory or presumptive, and denied CBS's fee request because Fairfax's allegations were not frivolous or made in bad faith. CBS appeals only the district court's interpretation of the statute, a legal question we review de novo. *See Brown & Pipkins, LLC v. Serv. Emps. Int'l Union*, 846 F.3d 716, 729 (4th Cir. 2017).

The Supreme Court of Virginia has not interpreted Section 8.01-223.2(B), so we must apply state law to predict how that court would rule. *See Wells v. Liddy*, 186 F.3d 505, 527–528 (4th Cir. 1999). When interpreting statutes, the Supreme Court of Virginia has instructed that the intent of the legislature "must be gathered from the words used, unless a literal construction would involve a manifest absurdity." *Chase v. DaimlerChrysler Corp.*, 587 S.E.2d 521, 522 (Va. 2003) (internal quotation marks omitted). Thus, "[w]hen the language in a statute is clear and unambiguous, [the court is] bound by the plain meaning of that language." *Cummings v. Fulghum*, 540 S.E.2d 494, 496 (Va. 2001).

Section 8.01-223.2(B) states that a prevailing defendant "may" be awarded attorney's fees, and the Supreme Court of Virginia has consistently treated the word "may" as "*prima facie* permissive, importing discretion." *Harper v. Va. Dept. of Tax'n*, 462 S.E.2d 892, 898 (Va. 1995) (internal quotation marks omitted); *see also AME Fin. Corp.*

16

*v. Kiritsis*, 707 S.E.2d 820, 824 (Va. 2011) ("[U]se of the word 'may,' as opposed to 'shall' . . . evidences . . . discretion to grant or refuse the defendant's motion . . . ."); *Spindel v. Jamison*, 103 S.E.2d 205, 208 (Va. 1958) ("The word 'may' should not be construed to mean 'must' or 'shall,' unless the clear intention of the legislature demands it."); *cf. Agbapuruonwu v. NBC Subsidiary (WRC-TV), LLC*, 821 Fed. App. 234, 242 (4th Cir. 2020) (per curiam) (reasoning that "[t]he word 'may' [in Section 8.01-223.2(B)] means just what it says: that a court has discretion to award (or not to award) attorney's fees" (internal quotation marks omitted)). By contrast, in other statutes the Virginia legislature had made an attorney's fee award mandatory through use of the word "shall." *See*, *e.g.*, Va. Code Ann. §§ 2.2-4030(A), 9.1-704(B). And, of course, the legislature used the word "shall" in the immunity provision of Section 8.01-223.2(A), immediately preceding the provision at issue here. All this convinces us, in accordance with the plain meaning of the word "may," that Section 8.01-223.2(B) is permissive, authorizing the court to award fees in its discretion.

CBS contends that although Section 8.01-223.2(B) is not mandatory, we should construe it to create a presumption in favor of awarding attorney's fees to a prevailing defendant. CBS summons nothing in Virginia law to support a presumption but instead relies on judicial interpretation of D.C.'s anti-SLAPP law, which differs from Virginia's law in two important respects.

First, the attorney's fees provision of D.C.'s anti-SLAPP law provides that a court "may award" fees to a prevailing defendant but "may award" fees to a prevailing plaintiff "only if the court finds that [the] motion [to dismiss or quash] is frivolous or is solely

17

intended to cause unnecessary delay." D.C. Code § 16-5504. The D.C. Court of Appeals relied on this contrast between prevailing defendants and plaintiffs in deciding that a prevailing defendant is presumptively entitled to fees unless special circumstances render a fee award unjust. *Doe v. Burke*, 133 A.3d 569, 573–575 (D.C. 2016). Virginia's law does not include any contrasting reference to fee awards authorized only upon a finding of frivolousness or bad faith.

Second, the D.C. fee statute applies only to special motions to quash or dismiss at a preliminary stage of the litigation. *See* D.C. Code §§ 16-5502, 16-5503. By contrast, the Virginia fee statute authorizes an award whenever a suit is dismissed pursuant to anti-SLAPP immunity, whether at the threshold, at summary judgment, or after a trial on the merits. The appropriateness of a fee award may vary significantly across the timeline of a lawsuit, and reading a presumption into the statute would restrict the court's discretion to distinguish between differing circumstances.

CBS's comparison to Title VII similarly fails to support its cause. Although a prevailing Title VII plaintiff is presumptively entitled to recover attorney's fees, a prevailing defendant may recover fees only if the plaintiff's action "was frivolous, unreasonable, or groundless." *Fox v. Vice*, 563 U.S. 826, 833 (2011) (quoting *Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 421 (1978)). A defamation defendant entitled to anti-SLAPP immunity under Virginia law is not in the same position as a prevailing Title VII plaintiff.

Seeing no reason to embellish the plain language of Virginia's statute, we conclude that Section 8.01-223.2(B) permits, but does not require, a court to award attorney's fees

18

to a prevailing defendant and does not create a presumption in favor of a fee award. We therefore affirm the district court's exercise of its discretion in denying CBS's motion for fees.

* * *

For the foregoing reasons, the judgment of the district court in these consolidated appeals is

*AFFIRMED*.